THE STATE OF OHIO, APPELLEE, v. MOORE, APPELLANT.

[Cite as State v. Moore (1973), 47 Ohio App. 2d 181.]

(Nos. 7137 and 7138—Decided December 12, 1973.)

*Mr. Stephan Gabalac,* prosecuting attorney, and *Mr. Frederic L. Zuch,* for appellee.

*Messrs. Parker & Parker,* for appellant.

MAHONEY, J. The defendant (appellant), Barry K. Moore, was convicted of charges in two separate indictments for delivery of a barbiturate, in violation of R. C. 3719.24(A). The jury found that the defendant sold one "hit" on February 26, 1972, and two "hits" on March 8, 1972, to David Moore (no relation of the defendant's), an undercover agent for the sheriff's office. Both sales alleg-

edly took place at the Bowlarama (a bowling alley, with an adjacent bar called the Lion's Den and, also, a combination pinball and pool room which was frequented by the devotees of rock music).

The defendant has appealed the convictions, setting forth eight assignments of error, the first of which has ten branches.

*First Assignment of Error (branches IA, IC, ID, and IH).* These assigned errors deal with the chain of evidence on state's exhibits 1 and 2, which were the February 26 and March 8 "hits" sold to the undercover agent. We have examined the record and find that within a few hours of receiving the "hits," which were in white powder form, and wrapped in ordinary kitchen aluminum foil, David Moore delivered them personally to Sergeant Robert Scalise. Scalise, in turn on each occasion, placed them in a plastic vial, after first marking and then sealing them, after enclosing an identifying tag.

On each occasion, the vial was placed into and kept in an evidence locker in the sheriff's office. The vials were removed, on each occasion, by Sergeant Scalise, and personally taken by him to the state bureau of criminal identification, in Richfield, Ohio. The vials were checked in by a receptionist. Scalise did not see them again until he returned, on separate occasions, to obtain and return each to the sheriff's evidence locker.

During trial preparation, Scalise was informed that the technician, who had performed the tests, was no longer employed by the state and would not be available to testify. Therefore, on November 21, 1972, Scalise returned both vials to the B. C. I. laboratory, and turned them over to a different receptionist.

Mr. David Kish, a technician at B. C. I., testified that he received both vials from the receptionist on November 21. He further testified that the vials were on his desk, or in the work area, for about a week before he was instructed by Henry Dombrowski, Director of the laboratory, to perform the tests. He further testified that he recognized the handwriting on the seal and markings as that of a tech-

nician who was no longer employed at B. C. I. Mr. Kish also testified that he performed the tests on November 28, and resealed the vials. He personally brought the vials to Akron for this trial, on November 30, 1972, and turned them over to Sergeant Scalise, who gave them to the prosecuting attorney.

Neither the receptionists, nor the technician who first performed the tests, testified as to their roles in the case. The burden of establishing a chain of evidence to identify the specimens or exhibits is upon the state. (*Columbus* v. *Marks* [1963], 118 Ohio App. 359.) However, the burden is not an absolute one. Where there is no evidence indicating confusion with the identity of the specimnen or of the possibility of tampering with it, then the testimony of the expert should be admitted. (*State* v. *Myers* [1959], 82 Ohio Law Abs. 216.) The practicalities of proof do not require the state to negate all possibilities of substitution or tampering. The state need only establish that it is reasonably certain that substitutions, alteration or tampering did not occur. (*Eisentrager* v. *State* [1963], 79 Nev. 38, 378 P. 2d 526.)

We find that there was sufficient evidence connecting all of the chain of events, and precluding, with reasonable certainty, any substitution, alteration or tampering. Therefore, assignments of error IA, IC, ID, and IH are overruled, as the state has properly shown a chain of evidence, and state's exhibits "1 and 2," as well as the testimony of David Kish, were properly admitted.

*Assignment of Error IB*:

The defendant claims the state failed to prove that the substances in state's exhibits 1 and 2 were, in fact, substances within the special statutory definition of a barbiturate, as contained in R. C. 3719.23(A), which reads:

" 'Barbiturate' means the salts and derivatives of barbituric acid, also known as maloynl urea, having hypnotic or somnifacient action, and compounds, preparations, and mixtures thereof."

This claimed error we interpret as being that it was against the manifest weight of the evidence for the jury to

184

find that the substances in state's exhibits 1 and 2 were, in fact, "salts and derivatives of barbituric acid * * * having hypnotic or somnifacient action * * *."

Deputy David Moore testified that, on the night of February 25-26, 1972 (when he met Rodney Baker, who was in a car with the defendant, Barry Moore, in the Bowlarama parking lot), Baker said to him (David Moore): "I just did some out of sight seconal." When asked where he got it, Baker said: "from my friend here" (who was the defendant). Baker introduced David Moore to Barry Moore. David testified that he asked Barry if he had any more left, and Barry replied: "Yes, I have single hits for a dollar and double hits for $2." David then purchased a "hit" from Barry.

David Moore also testified that, on March 8, 1972, Barry approached him at the pool table in the bowling alley, with the statement: "I have those two hits of seconal for you." David then purchased a double hit from Barry. David testified also that seconal was a barbiturate.

The technician, David Kish, testified that a barbiturate is a depressant. He further described the testing of the substances that he had done at the B. C. I. laboratory, finding that the substances were barbiturates. During his direct examination, the trial court read to the jury the statutory definition of barbiturate, as set forth above. Then the prosecuting attorney asked the following question:

"Now, in your expert opinion, do the results of your tests of State's Exhibit I show the substance that you examined met the statutory definition just given by the court, in your opinion?"

The answer "Yes."

The same question and answer was testified to concerning state's exhibit 2.

After the state had rested its case, the defendant offered the testimony of Doctor Allan F. Krivis, a professor of chemistry at the University of Akron. Dr. Krivis' testimony essentially concerned the reliability of the testing devices, and the methods used by the B. C. I laboratory. He had not actually examined or tested state's exhibits 1 and

2. His opinion was that the three tests performed by the state were not individually conclusive of the presence of a barbiturate in the substance. He also felt that those tests (cobalt acetate, copper sulfate and ultraviolet spectrophotometer), could not determine, even if a barbiturate were present, whether or not it had "hypnotic or somnifacient action."

He further testified that barbituric acid, in and of itself, is not physiologically active. He said that it can only be so when its chemical structure is changed by 5-5 di-substitution, at the number 5 carbon position. If you substitute six or more carbon atoms instead of five, then the substance becomes a convulsant. His testimony was basically that the tests would get positive results from other substances, and that other materials could give the same type of curve as shown on the graphs, state's exhibits F and G. His opinion was that chromatographic tests should be run to separate out foreign matter and impurities, and to isolate the material to be examined before performing the various tests. After determining the presence of a barbiturate, he would use other physical and chemical tests, including quantitative analysis and the infrared photospectrometer, to determine if the barbiturate had hypnotic or somnifacient qualities by ascertaining whether or not it was a 5-5 di-substituted compound.

Doctor Krivis did testify that seconal was a barbiturate, and that it was a 5-5 di-substituted compound, having hypnotic or somnifacient action. After the defense rested, the state offered the testimony of Charles L. Miller (a pharmacist), and Henry Dombrowski (a chemist, and director of the B. C. I. laboratory). The pharmacist testified that all barbiturates, in the proper dosage level, have hypnotic or somnifacient action. Upon cross-examination, he testified that barbituric acid derivatives that were mono-substituted were inactive, while the di-substituted were active as central nervous system depressants.

Henry Dombrowski's testimony reviewed the testing procedures in the B. C. I. laboratory and particularly concerned the ultraviolet spectrophotometer. He testified that,

186

when a barbiturate is found to be present in a given substance, the procedure then is to run a buffer solution test. In this test, the P. H. factor of a solution is changed and the U. V. spectrophotometer test is run a second time. This test shows a different curve result on the graph. This is known as a buffer shift. He explained that this particular shift is a characteristic of 5-5 di-substituted barbiturates. He testified that, to his knowledge or experience, it was the only material that produced such a shift. He further testified that the infrared photospectrometer was more precise than the ultraviolet spectrophotometer. The former could tell them which barbiturate was present, whereas the latter told them only that a barbiturate was present. He said that this was all they needed to know if the buffer shift showed the presence of the 5-5 di-substituted barbiturate.

From all of the foregoing evidence, we find that the jury could reasonably have concluded, beyond a reasonable doubt, that the substances in state's exhibits 1 and 2 were, in fact, barbiturates, having hypnotic or somnifacient action.

Therefore, assignment of error IB is overruled.

*Assignment of Errors IE, II, and IJ.*

These deal with alleged error by the trial court in failing to sustain motions for a directed verdict at the close of the state's case, the defense's case and, also, at the conclusion of the trial. Each claimed error is predicated upon alleged gaps in the chain of evidence claimed in assigned error IA, and a failure to show the substance as having hypnotic and somnifacient action as argued in IB. At the conclusion of the state's case, the court had before it the testimony of David Moore (the undercover agent); Sergeant Scalise, and David Kish (the technician who examined state's exhibits 1 and 2).

We find the law to be that the court may not grant a motion for a directed verdict, so long as there is evidence before the court tending to sustain all the essential elements of the crime charged in the indictment. *State* v. *Axe* (1928), 118 Ohio. St. 514; *State* v. *Gross* (1914), 91 Ohio St. 161; and *State.* v. *McGrew* (1971), 25 Ohio App. 2d 175.

The essential elements of each of these crimes are as follows: (1) on such date and at such place (venue), (2) defendant, Barry K. Moore (3) did knowingly and intentionally (4) deliver to another (5) a barbiturate.

The combined testimony of Deputy David Moore, Sergeant Scalise, and technician David Kish tend to sustain each of those elements by identifying Barry Moore as one who, in Summit County on two occasions, sold for cash "white substances" which were identified as seconal. The testimony of Sergeant Scalise and David Kish tend to prove that those same white substances were tested and examined by Kish, and shown to be a barbiturate with hypnotic or somnifacient action.

Assignment of Error IE is not well taken.

The testimony of Doctor Krivis, during the defense case, did not negate the state's basic evidence tending to sustain each element of the offense. It did raise issues of fact concerning the state's testing procedures and their results, which questions were for the jury to decide.

The testimony of Miller and Dombrowski concerned the basic elements of the state's case, and it was on the same issues of fact as was the tetimony of Doctor Krivis. There was sufficient evidence of each essential element from which the jury could find the defendant guilty beyond a reasonable doubt.

*Assignment of Error IF*:

Defendant argues that the trial court erroneously permitted the state to offer new evidence on rebuttal. The purpose of rebuttal is to permit the state the opportunity to refute new evidence in chief offered by the defense. The testimony of Miller and Dombrowski was not repetitive of the state's case, but it was to rebut the defense testimony by Doctor Krivis that the state could not conclusively determine the existence of a barbiturate, nor its hypnotic or somnifacient qualities, by the testing procedures that were used by the state.

The trial court did not err in permitting this testimony.

*Assignment of Error IG*:

It was not error for the trial court to refuse the right

of surrebuttal to the defense. The profert shows that the defense desired to return Doctor Krivis to the stand, to refute the rebuttal testimony of Dombrowski. This matter was discretionary with the trial court, and the court exercised its discretion without abuse, so that the interests of justice were duly served.

*Second and Third Assignments of Error*:

The defendant contends that the trial court should have sustained his challenge to the array of both the grand and petit jurors, on the grounds that there has been a denial of his constitutional rights in that 18, 19, and 20 year old persons have been exempted from jury service by the order of the Court of Common Pleas. Defendant also argues that the trial court should have sustained his motion to quash the indictments for the same reason.

Testimony taken on the challenge reveals that 18, 19, and 20 year old persons have been permitted to register to vote in Summit County, and that their names were on the poll lists from which the prospective grand and petit jury venire were drawn by key number. One of the jury commissioners testified that a form questionnaire is mailed to each prospective juror. The form requests information as to age, employment, marital status; sex; pre-school children; criminal record; prior jury service; physical disability; and literacy. The last question is a catch-all;

"2. Do you know of any reason why you cannot serve as a juror ...... If so, state reason under remarks. ......

"Remarks ..........................................
....................................................."

The form questionnaires were mailed back to the jury commissioners. The questionnaire provided that the prospective juror "*solemnly affirm that the answers * * * are true and correct * * * to the best of my knowledge and belief.*" (Emphasis supplied.) Signatures were required, but it was not notarized or otherwise witnessed.

Upon receipt of the completed forms, they are examined by the jury commissioners. If question 12 is answered "Yes," and if the remarks under question 12 indicate that the prospecitve juror is a full or part-time student, or quali-

fies under seven other categories, he or she is excused from jury service, pursuant to the authority of an order of the Court of Common Pleas of Summit County, entered on April 28, 1972, which provides, in its pertinent parts:

"Therefore, the following is adopted as the policy of the court as it relates to exemptions of jurors:

"(A) Persons in the following categories may be exempted from jury service upon request by them.

"(1) Full time students.

"(2) Part time students who have any regularly scheduled class between 7:00 A. M. and 6:00 P. M. Monday through Friday."

R. C. 2313.12 provides that the commissioners alone shall determine the qualifications and exemptions until notice for service, and it limits them to such as are created by R. C. Chapter 2313 and the general statutes of the state. We are not called upon to determine whether the order of the Court of Common Pleas created an exemption or a qualification. Perhaps it is an "excuse," within the meaning of R. C. 2313.16, which provides that the Court of Common Pleas may excuse a person liable to serve as a juror where *"the interests of the public, or of the juror, will be materially injured by his attendance."* (Emphasis supplied.)

However, the excusing or exempting of prospective jurors under this order of the Court of Common Pleas is not under oath or by the oath of another person acquainted with the facts. It is well established that voter registration lists, as the source of prospective jurors, are not constitutionally unlawful because they exclude non-voters. *United States* v. *Kelley* (C. A. 2, 1965), 349 F. 2d 720 (certiorari denied 384 U. S. 947). The Supreme Court, in *State* v. *Johnson* (1972), 31 Ohio St. 2d 106, held that the provisions of R. C. 2313.06, and likewise the Constitution, do not forbid the states from prescribing qualifications and making some discriminations, such as specified qualifications of age and educational attainment. *Carter* v. *Jury Commission of Greene County* (1970), 396 U. S. 320. We find that the law is succinctly stated by Justice Harlan, in *Hoyt* v. *Florida* (1961),

368 U. S. 57, at 59, where he says, when discussing the right to an imparially selected jury as assured by the Fourteenth Amendment:

"That right does not entitle one accused of crime to a jury tailored to the circumstances of the particular case, whether relating to the sex or other condition of the defendant, or to the nature of the charges to be tried. It requires only that the jury be indiscriminately drawn from among those eligible in the community for jury service, untrammeled by any arbitrary and systematic exclusions."

It has further been held that it is not necessary that every jury contain representatives of all economic, social, religious, racial, political and geographical groups of the community. *Thiel* v. *Southern Pacific Co.* (1946), 328 U. S. 217.

The record fails to reveal that there was, in fact, an arbitrary and systematic exclusion of 18, 19 and 20 year old persons from the jury venires. The defendant's rationale erroneously assumes that all 18, 19 and 20 year old persons are students, and that all students are only 18, 19 or 20 years of age. The rationale further fails because the Common Pleas Court order extended students a privilege of being "exempted" upon request. There is no evidence that the 18, 19 or 20 year old students, who answered "No" to question 12 in the questionnaire, were ever excluded from service.

The authority of the court to create two student classifications of persons who could request exemption from service as jurors, might be open to question, in view of R. C. 2313.12. The "exemptions" thus created might be considered to be "excuses," the request for which should be made in open court, under oath, after a call for service, pursuant to R. C. 2313.16 and R. C. 2313.17. We are not here called upon to decide those questions or to interpret those code sections. Regardless of the interpretation of that court order, there is no evidence of any arbitrary or systematic exclusion. In fact, the excuse or exemption created could only be had at the request of the "student." No effort was made to exclude any students. Nothing has been shown that is in any way prejudicial to this defendant.

He was tried by a representative cross-section of those eligible for jury service. Accordingly, assignments of error numbers two and three are overruled.

*Fourth Assignment of Error*:

The error claimed here is the denying of the defendant and defense counsel, "the right to participate in an in camera inspection of previous notes, statements and reports made by prosecution witnesses, including statements made by [sic] [to] the Grand Jury."

The issue is the interpretation to be placed on *State* v. *White* (1968), 15 Ohio St. 2d 146, as to the manner in which the "in camera inspection" is to be conducted.

The facts are that: (1) the court ordered Deputy David Moore to produce "all the records that you have still existing relating to these two indictments"; (2) the next morning Deputy David Moore and/or Sergeant Scalise produced a file folder containing several papers; (3) the trial judge and attorneys retired to chambers, and the trial judge alone examined the papers in the file folder; (4) the judge removed two legal pad sheets from the folder, which he handed to defense counsel to examine (these are now labeled as defendants-appellants exhibits 1 and 2); (5) the judge did not permit defense counsel, or the prosecuting attorney, to see any other papers in the file folder.

The trial judge informed defense counsel that these two sheets comprised the only statements in the file folder prepared by Deputy Moore concerning these two indictments. The judge also found that the statements were not inconsistent with the testimony and could not be used for cross-examination by the defense.

The defendant claims that his counsel had a right to see and inspect everything in the file folder to determine what was, in fact, prepared by the witness, not just those selected by the judge for him to see and inspect relevant to inconsistency. He further desired and believed that he was entitled to the opportunity to cross-examine the witness as to the statements and their preparations. He also requested handwriting examples to determine their authenticity.

We agree with the trial court's interpretation of the

192

*White* case. The "in camera inspection" is for the judge to determine if there were, in fact, any inconsistencies between the testimony of the witness and his prior statements. This does not mean that there is a carte blanche order for defense counsel to rummage through the files of the sheriff or the prosecuting attorney to ascertain if there were any prior statements, writing, papers or reports prepared by a particular witness. The prosecution, and its witnesses were under orders to produce certain papers. Obviously, they produced more than statements or reports by Deputy Moore.

In the interest of protecting confidential relationships, undercover activities, and a lawyers's work product, any questionable papers should be inspected privately by the trial judge, to determine if they qualify as statements, reports, or near verbatim accounts by the witnesses. Certainly, we should and must rely on the integrity and ability of our trial bench to make this decision. If the papers do qualify, then the prosecuting attorney and defense counsel may be permitted to examine them. The judge decides whether or not there is any substantial inconsistencies sufficient to warrant giving the statement to defense counsel for purposes of cross-examination.

This same assignment of error also seeks to obtain a transcribed copy of Deputy David Moore's grand jury testimony. We believe that the defendant has failed to show any particularized need for such inspection, in accordance with the rule in *State* v. *Laskey* (1970), 21 Ohio St. 2d 187, and *State* v. *Patterson* (1971), 28 Ohio St. 2d 181.

*Fifth Assignment of Error:*

This alleged error relates to the denial by the trial court of the defendant's attempt to call an alleged expert to testify concerning a "lie detector" or polygraph examination, and a refusal of the court to permit a profert of such testimony by defense counsel.

The law in Ohio is well established that evidence of a "lie detector" or polygraph examination is not admissible in evidence. *Parker* v. *Friendt* (1954), 99 Ohio App. 329; *State* v. *Hegel* (1964), 9 Ohio App. 2d 12 (dicta). At least

one Ohio court has admitted such evidence where there has been a stipulation to its use, and results by the parties. *State* v. *Towns* (1973), 35 Ohio App. 2d 237. This is essentially the uniform rule throughout the country. Annotation, 23 A. L. R. 2d 1306. Knowing the state of the law, it, certainly was not error for the trial judge to refuse the witness's testimony. It was error for the trial court to refuse the profert into the record of the testimony of the expert witness. However, knowing what the state of the law is, it obviously cannot have been in any way prejudicial to the defendant.

The defendant, as suggested by the trial court, has called the alleged "merits" and developments in the use of the polygraph in the last twenty years to our attention in his brief. We fail to find that the polygraph has achieved that state of development and operation where it has scientific recognition and public acceptance sufficient to warrant its admission in evidence.

*Sixth Assignment of Error:*

We do not find any merit in the academic argument, unsupported by any authorities, that the trial court committed prejudicial error by refusing to dismiss the indictments on the ground that R. C. 3719.23(A) is unconstitutional. Neither it, nor its penalty section abridge any freedoms reserved to people under the Ninth and Tenth Amendments. Such sections are not cruel and unusual punishment under the Eighth Amendment, and they do not deny equal protection of the laws under the Fourteenth Amendment.

*Seventh Assignment of Error:*

The trial court did not err in refusing the admission in evidence of defendant's Exhibits E, K and J. Exhibit E was a schematic drawing on the board used to facilitate the cross-examination of Deputy Moore. It is not real, demonstrative or physical evidence. Exhibits I and J are a framed certificate and badges earned by the defendant in the Boy Scouts. They were testified to orally on the basis that the defendant's character was in issue. Their admittance would be unnecessarily redundant and repetitive of oral testimony.

*Eighth Assignment of Error:*

This is the rehash of all the assignments of error which occurred on the hearing of the motion for new trial. For all of the reasons heretofore set forth, the trial court correctly overruled the motion for a new trial.

We have examined all of the evidence, and have spoken individually to each of the assignments of error. We have not found any error prejudicial to the substantial rights of the defendant. We find that the defendant was afforded a fair and impartial trial before a competent judge, and that he was effectively represented by able counsel. We also find that there was substantial credible evidence from which the jury could find the defendant guilty, beyond a reasonable doubt, of each of the charges set forth in the indictments.

Upon a consideration whereof, the judgment of the trial court, entered upon the verdict of the jury, is affirmed.

*Judgment affirmed.*

BRENNEMAN, P. J., and VICTOR, J. concur.