OPINION
Defendant-Appellant Gregory R. Montgomery, Jr. appeals the trial court's decision overruling his motion to suppress, along with his convictions for trafficking in cocaine and two counts of possession of crack cocaine. For the reasons stated herein, we affirm the judgment of the trial court.
Montgomery was indicted on November 17, 1997, on one count of trafficking in cocaine, in violation of R.C. 2925.03, having committed said offense within one thousand feet of the boundaries of a school; one count of possession of crack cocaine, in an amount less than one gram, in violation of R.C. 2925.11; and one count of possession of crack cocaine, in an amount exceeding one hundred grams, but in an amount less than five hundred grams, in violation of R.C. 2925.11. Montgomery filed his discovery demand on December 15, 1997, and a motion to compel discovery was filed on January 28, 1998. On March 10, 1998, Montgomery filed a motion to suppress and a hearing was held on April 17, 1997.
At the suppression hearing, Springfield Police Detective Gerald Scott Woodruff testified that he was working undercover with Detective Jimmy Cosby in the early morning hours on November 8, 1997, attempting to make on-the-street crack cocaine purchases. Det. Woodruff was "flagged down" (a common gesture by dealers to see if the person driving by is looking for any drugs) by Montgomery in an area known for its high drug activity. The detectives drove around the block and stopped at the corner where Montgomery was standing. Montgomery shouted to the detectives, "What do you need?" Det. Woodruff responded, "You got a 20?" indicating his interest in a piece of crack cocaine worth $20. Montgomery replied, "Yeah," and directed them to a dimly lit parking lot approximately 50 yards east of the intersection. Det. Woodruff turned around and drove into the lot. Montgomery and a female, Noel Yates, walked toward the lot. Yates approached the car and sold Det. Woodruff a piece of crack cocaine for $20. After the transaction, Det. Woodruff watched Montgomery and Yates walk from the lot together. The detectives radioed officers who were standing by to arrest the pair.
Officer John McCoy testified that just after 11 a.m. on November 8, 1997, he and Officer Andrew Scott were sent to the Knights Inn to respond to a call from the general manager, Phillip Patel. According to Officer McCoy, Patel had called the police after several groups of people had come to the motel during the night wanting access to Room 111, which he had rented to Montgomery. Upon his refusal to give them access to the room, the visitors became very belligerent, and later attempted to kick in the door to Montgomery's room. Patel told Officer McCoy that he contacted the police because he was concerned about the high level of activity surrounding Room 111. Additionally, Montgomery was scheduled to have checked out at 11 a.m. that day, and Patel wanted to make sure that "there was nothing in the room that shouldn't be" when he cleared out the room. Officer McCoy stated that Patel had led the officers to the room, unlocked the door, and the three of them entered.
As he entered the room, Officer McCoy noticed a small baggie of crack cocaine on the table. Patel was busy gathering clothes and other belongings in a pile. During this process Patel opened the refrigerator door and Officer McCoy, who was standing across the room, noticed a plastic bag wedged in the freezer compartment. Officer McCoy retrieved the bag, which contained more than 200 grams of crack cocaine. The officers began a search of the room, discovering $7,900 in a bag under the bed and more crack cocaine in the dresser.
At the close of the suppression hearing, the trial court stated its findings of fact and conclusions of law on the record. The trial court found that the officers had gone to the motel and had entered the room at the request of Patel, who had had a "legitimate concern" about entering the room after there had been so much activity in the preceding hours. The trial court concluded that the officers had entered Room 111 after 11 a.m., therefore Montgomery's time of occupancy had expired. Furthermore, upon Patel unlocking the door and entering the room with the officers, crack cocaine was in plain view on the table. Shortly thereafter, Officer McCoy observed a bag in the refrigerator which was filled with crack cocaine.
The trial court overruled the motion to suppress, stating that "the officers' entrance at the request of and in the company of the owner or manager gives them a legitimate reason to enter the premises and then observe what is obvious." Montgomery filed a request for findings of fact on April 23, 1998. The trial court overruled the request on May 7, 1998, stating that it had properly articulated its findings of facts and conclusions of law at the close of the suppression hearing.
Montgomery's trial commenced on August 24, 1998. During the two-day trial, the following additional facts were revealed.
Regarding the officers' purchase of crack cocaine, Det. Woodruff and Det. Cosby testified that the purchase had occurred at approximately 12:40 a.m. on November 8, 1997, and that they had purchased a $20 piece of crack cocaine from Montgomery and Yates. Det. Woodruff had written down the serial numbers on the $20 that he had handed to Yates. Det. Cosby testified that Montgomery had remained near the rear panel of the passenger side during the transaction.
Immediately after completing the transaction, Det. Woodruff radioed for back up to arrest Yates and Montgomery. Officers Louis Turner and Art Holmes immediately proceeded to the area and observed the couple approach a green 1994 Nissan Maxima. Officer Turner restrained Montgomery as he entered the driver's side of the car, and Officer Holmes restrained Yates as she entered the passenger's side. The officers discovered $165 on Montgomery. Yates had $108, including the marked $20 bill, and a key on a key chain from the "Park Terrace Motel," the former name of the Knights Inn.
Regarding the officers' search of Room 111, Patel testified that Montgomery had arrived at the motel on November 1, 1997 at approximately 2:30 a.m. The next morning, Montgomery approached Patel and asked to rent a room with a refrigerator for a week. Montgomery paid for the week's rental of Room 111 in cash. His scheduled check out time was to be November 8, 1997 at 11:00 a.m.
According to Patel, at 3 a.m. on November 8th, two black males approached him to see if they could gain entrance into Montgomery's room. They claimed they had been visiting with Montgomery earlier, and had left books and keys in the room. Patel refused, and the men left. The men returned a short time later and attempted to kick in the door to Room 111, however Patel chased them away. At one point after this incident, Patel placed a security knob over the lock so that no one, including Montgomery, could gain entrance to the room without first going to the office.
At 5 a.m. another black male came to Patel's office, requesting that he let him into Montgomery's room. This man claimed that he wanted to visit with Montgomery; Patel refused to let him into the room, and the man left. At 9 a.m., one of the men returned with a woman to ask Patel if he would let them into the room. The woman, Bernadette Jackson, claimed that she had visited with Montgomery and had left her shoes, a "bunch" of keys, and some books in his room. Patel refused to allow her into Montgomery's room, but she was adamant in remaining there until she retrieved her belongings.
At 11 a.m., the motel's check out time, Patel called the police to assist him in entering Montgomery's room and clearing any belongings from the room. Patel claims that he unlocked the door and waited outside the room because the police had found crack cocaine on the table near the television.
Officers McCoy and Scott each testified that they had arrived at the Knights Inn shortly after 11 a.m. The officers stated that Patel had unlocked the door and had entered the room with them. They immediately spotted the baggie with 0.33 grams of crack cocaine on the table. Officer McCoy eventually discovered 0.21 grams of small crack cocaine rocks in a baggie in the dresser drawer and $7,900 in a plastic bag under the bed. When Patel opened the refrigerator, Officer McCoy spotted a baggie in the freezer containing 282.97 grams of crack cocaine.
On August 25, 1998, the jury found Montgomery guilty of one count of drug trafficking of cocaine, in violation of R.C.2925.03, a felony of the fourth degree, one count of crack cocaine possession, in violation of R.C. 2925.11, a felony of the fifth degree, and one count of crack cocaine possession, in violation of R.C. 2925.11, a felony of the first degree subject to a mandatory prison term.
Montgomery was sentenced on August 26, 1998. At the suppression hearing, Montgomery admitted to selling drugs for over ten years, since he was thirteen years of age. The trial court made the specific finding that Montgomery was "a major drug offender possessing in excess of 100 grams of crack cocaine," and that he had showed no remorse for his actions. Accordingly, on the higher degree possession charge, the trial court sentenced Montgomery to the mandatory ten year term plus an additional nine years, for a total of nineteen years, and a $10,000 fine. The trial court sentenced Montgomery to seventeen months on the trafficking conviction and eleven months on the lesser degree possession charge, to be served concurrent to each other and concurrent to the other sentence. The trial court filed a judgment entry journalizing this decision on September 21, 1998.
Montgomery filed his notice of appeal on September 24, 1998, and he now asserts seven assignments of error, which we will address in an order that facilitates our discussion.
 I. The trial court erred in overruling Appellant's motion to suppress evidence gained in violation of his constitutional rights.
Montgomery argues that the police conducted an illegal warrantless search of his motel room between 9:30 a.m. and 10 a.m., prior to the 11 a.m. check out time. He further alleges that the State did not prove that the plain view exception applied to the evidence found in the freezer, in the dresser, or under the bed, and thus all evidence from this illegal warrantless search should have been suppressed.
The record from the suppression hearing more than amply supports the trial court's decision that Montgomery's tenancy had expired at 11 a.m. We believe Montgomery's confusion arises not from testimony at the suppression hearing, but from testimony at trial. At trial, Patel initially stated that he and the officers had entered Room 111 between 9:30 and 10 a.m. However, Patel was clear in the remainder of his testimony at trial that the search had occurred after check out time, which would have been after 11 a.m. At the suppression hearing and during trial, Officers McCoy and Scott were adamant that they were not called to the Knights Inn until 11 a.m., and that they had arrived at the motel after 11 a.m. Under the facts testified to at the suppression hearing, the trial court did not err in finding that the officers had entered the room after the 11 a.m. check out time.
Having determined the time of the search, we must now examine whether Montgomery retained an expectation of privacy in his hotel room after check out time. A registered guest does have a legitimate expectation of privacy in his hotel or motel room.State v. Miller (1991), 77 Ohio App.3d 305, 312. Montgomery relies heavily on the decision in Miller, supra, which held:
 [C]onsent by the hotel management is lawful when the guests surrenders {sic} or no longer rents the room. A hotel guest automatically relinquishes his room at check-out time, when he has not paid for another night and the key has been returned to the hotel management.
Id. at 312-313, citing United States v. Savage (C.A.5, 1977),564 F.2d 728, 733. Although Montgomery places emphasis on the Miller
court's mentioning that the key was returned to the management prior to the relinquishment of the right to privacy, we find that to be of less significance than the fact that the check out time had passed.
Another Ohio court that directly addressed this issue held that the right to privacy is relinquished upon the termination of the renter's tenancy:
 A motel employee may give consent to a search of a motel room in a situation where the renter or occupant has either abandoned the room or has surrendered his or her tenancy. Obviously, such surrender occurs when a guest does not pay for another night's stay by check-out time.
State v. Hall (1994), 66 Ohio Misc.2d 80, 83, citing Abel v.United States (1960), 362 U.S. 217; Savage, supra. Many courts outside of Ohio have reasoned cases similar to the Hall court. The Sixth Circuit decided in United States v. Allen (C.A.6, 1997),106 F.3d 695, that once a guest's rental period expires or has been lawfully terminated, that guest "`does not have a legitimate expectation of privacy in the hotel room or in any article therein of which the hotel lawfully takes possession.'" Id. at 699, quoting United States v. Rahme (C.A.2, 1987), 813 F.2d 31, 34. Other courts have held that turning in the motel key is not a prerequisite to giving up the right to privacy in a motel room, but that simply the expectation of privacy in the room and articles therein expire upon the expiration or termination of the rental period. United States v. Huffhines (C.A.9, 1992),967 F.2d 314, 318 (a guest has no expectation of privacy once the rental period of the motel room has expired); United States v. Parizo
(C.A.2, 1975), 514 F.2d 52, 54-55 (a guest's right to privacy in a motel room expires when the term of the occupancy expires; at that point the manager of the motel has the right to enter the room and to consent to a search); United States v. Cowan (C.A.2, 1968),396 F.2d 83, 86-87 (guest lost right to privacy in room and luggage left in room when he failed to pay for room for five days); UnitedStates v. Larson (C.A.8, 1985), 760 F.2d 852, 854 (although the guest intended to continue his occupancy in the rented motel room, he lacked a reasonable expectation of privacy upon remaining in room beyond the occupancy period without paying for the next day's rent).
In the present case, there was credible testimony during the suppression hearing that the officers had been summoned and had appeared at the motel after the 11 a.m. check out time. In light of the above analysis, we find that the officers' search of the motel room after check out time was proper, as Montgomery had relinquished all rights of privacy to the room when his check out time had expired. Accordingly, we find that the trial court did not err in overruling his motion to suppress.
Montgomery's first assignment of error is overruled.
We will now address Montgomery's fifth assignment of error, as it also relates to his motion to suppress.
 V. The court's failure to provide written findings of fact upon request prejudiced the Appellant and violated his constitutional right to due process.
Montgomery argues that the trial court erred by not honoring his request for findings of fact and conclusions of law. According to Crim.R. 12(E), "[a] motion made before trial other than a motion for change of venue, shall be timely determined before trial. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record." Without such findings, neither this court nor the Ohio Supreme Court can properly review the propriety of the trial court's ruling. City of Bryan v. Knapp (1986), 21 Ohio St.3d 64,64-65.
At the conclusion of the suppression hearing, the trial court did state its findings of fact and conclusions of law on the record. These findings fulfilled the purpose of Crim.R. 12(E), which was to enable us to review the propriety of the trial court's ruling. We do not find it necessary for the trial court to make additional written findings of fact, as the trial court fully complied with Crim.R. 12(E).
Montgomery's fifth assignment of error is overruled.
 II.
The verdict was against the manifest weight of the evidence.
Preliminarily, we note that in weight of the evidence challenges, an appellate court
 [R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. Although Thompkins
permits us to consider the witnesses' credibility when addressing a weight of the evidence challenge, we nevertheless accord substantial deference to a factfinder's decision as to which testimony to credit, and to what extent to do so. State v.Brickles (Sept. 2, 1999), Montgomery App. No. 17526, unreported. With this in mind, we proceed to the merits of Montgomery's assigned error.
As best we can discern from the brief, Montgomery argues that the officers conducted a "flawed investigation" by failing to obtain the identities of the "visitors," and that an insufficient chain of custody existed connecting the crack cocaine found in Room 111 to Montgomery. For these reasons, Montgomery argues that his convictions are against the manifest weight of the evidence.
After reviewing the entire record, we hold that the jury did not lose its way in assessing evidence, judging credibility, and resolving conflicts regarding any of the three convictions. To begin, we fail to see the connection between the officers' failure to pursue the early morning "visitors" and Room 111, and how that resulted in Montgomery's conviction being against the manifest weight of the evidence. If Montgomery is attempting to make the argument that the contraband discovered in Room 111 was the visitors' property, we do not agree with his reasoning. To the contrary, the visitors' inability to gain access to the room without Montgomery's or Patel's assistance corroborates the fact that Montgomery exerted control over Room 111 prior to check out time.
We also disagree with Montgomery's allegations that the chain of custody was "tainted." The prosecution bears the burden of establishing a proper chain of custody, although this burden is not absolute. State v. Moore (1973), 47 Ohio App.2d 181, 183, 1 O.O.3d 267, 268. The prosecution need only establish that it is reasonably certain that alteration, substitution, or tampering did not occur. Id.; 1 O.O.3d at 268. Furthermore, breaks in the chain of custody go not to the admissibility of evidence, but to the weight afforded to it. State v. Brown (1995), 107 Ohio App.3d 194,200; State v. Qualls (June 6, 1997), Clark App. No. 96-CA-68, unreported.
In the case at bar, the prosecution presented sufficient evidence to establish a proper chain of custody. Specifically, Montgomery argues that Patel interfered with the chain of custody of the contraband found in Room 111. Officers McCoy and Scott testified that Patel unlocked the door and entered Room 111 with them. Both officers testified that Patel had moved some of the items in the room, but that Patel had not "tampered" with the crack cocaine. In fact, Patel opened the refrigerator door and almost immediately closed it after deciding that nothing of interest was in the refrigerator. It was Officer McCoy, who had been standing on the other side of the room, who noticed a large baggie wedged into the freezer and removed it before Patel even noticed its presence. In light of the above discussion, we do not agree with Montgomery that Patel interfered with the chain of custody of the contraband found in Room 111.
Montgomery also contends that the State failed to establish a proper chain of custody of the crack cocaine and the money found in Room 111. Officer McCoy testified that he had found the baggies of crack cocaine on the table, in the dresser and in the freezer, and the money discovered under the bed. He placed all of the evidence into larger evidence bags and initialed each bag. It would be a reasonable inference that he transferred the crack cocaine to the lab and the money to the property room. Officer McCoy also testified that the baggies and their contents were the same substances and were in the same condition as when he discovered them in Room 111 on November 8, 1997. Todd A. Robinson, assistant forensic criminalist for the Springfield crime lab, testified that he analyzed the substances contained in the baggies that had Officer McCoy's initials. We agree that there was a gap in the chain of custody, however this became a credibility, or weight, of the evidence issue for the jury to resolve. After careful review of the record, we cannot find that Montgomery's convictions were against the manifest weight of the evidence based upon any deficiencies in the chain of custody.
As we stated before, we find that the jury did not lose its way in assessing the evidence, judging the credibility, and resolving any conflicts. Based upon this analysis, Montgomery's convictions are not against the manifest weight of the evidence and his second assignment of error is overruled.
 III. The Appellant was prejudiced by the prosecution's failure to disclose an incriminating statement allegedly made by the Appellant.
Montgomery argues error in the trial court's overruling of his objection to the State's opening argument when it referenced Montgomery's statement made during his arrest and booking into jail that he was unemployed. Defense counsel asserts that he was unaware that Montgomery had made any incriminating statements to the officers, but that such statement was highly prejudicial in the context in which it was inserted at trial. Additionally, Montgomery argues error in the trial court's decision that such statement fell within the "routine booking exception" to theMiranda rule, and that it was error to overrule his motion for a mistrial.
A mistrial may be granted, and a defendant retried, when there is a manifest necessity to do so, or to serve the ends of public justice. State v. Abboud (1983), 13 Ohio App.3d 62. A trial court's decision on a motion for mistrial is within its sound discretion, and is to be accorded great deference. Id. at 63.
In this case, the trial court overruled the motion for mistrial and found that the information at issue was not elicited for investigatory purposes, but was obtained as part of the routine booking process. In Pennsylvania v. Muniz (1990),496 U.S. 582, the United States Supreme Court determined that "routine booking questions" were an exception from Miranda requirements, and suppression of such statements was not necessary. The Court stated:
 We disagree with the Commonwealth's contention that Officer Hosterman's first seven questions regarding Muniz's name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation as we defined the term in [Rhode Island v. Innis (1980), 446 U.S. 291], merely because the questions were not intended to elicit information for investigatory purposes. As explained above, the Innis test focuses primarily upon "the perspective of the suspect." [Illinois v. Perkins (1989), 496 U.S. 292, 296.] We agree * * *, however, that Muniz's answers to these first seven questions are nonetheless admissible because the questions fall within a "routine booking question" exception which exempts from Miranda's coverage questions to secure the "`biographical data necessary to complete booking or pretrial services.'" [Citation omitted.] The state court found that the first seven questions were "requested for record-keeping purposes only," * * *, and therefore the questions appear reasonably related to the police's administrative concerns. In this context, therefore, the first seven questions asked at the booking center fall outside the protections of Miranda
and the answers thereto need not be suppressed.
Id. at 601-602. (Footnote omitted.)
Under this analysis, we find that the trial court did not err in finding the question was elicited for record-keeping purposes, not for investigatory purposes, and that the question was reasonably related to administrative concerns. Furthermore, the trial court instructed the jury that opening and closing statements were not evidence. In light of the above analysis, we do not find that the trial court abused its discretion in denying Montgomery's motion for a mistrial.
Accordingly, Montgomery's third assignment of error is meritless.
 IV. The Appellant's constitutional right to due process was violated by the prosecution's failure to disclose the names of all witnesses.
On the second day at trial, the prosecution was permitted to add Lt. Moody to its witness list. The purpose of Lt. Moody's testimony was solely to refute defense counsel's remarks in opening statements that an indication of Montgomery's innocence was the officers' failure to obtain prints from the baggies containing the crack cocaine. Defense counsel continued this inference during the cross-examination of Officers McCoy and Scott. Incidentally, defense counsel failed to request a continuance, and Lt. Moody testified that day. His testimony was short and concise, addressing the difficulties that evidence technicians have experienced in obtaining fingerprints from plastic baggies.
Discovery rules exist to protect against the surprise testimony of an undisclosed witness to the prejudice of the accused. See State v. Heinish (1990), 50 Ohio St.3d 231, 235-236, questioned on other grounds, State v. Biros (1997), 78 Ohio St.3d 426,446. The prosecution is required to timely disclose the identity of a witness. Id. See, also, Crim.R. 16. A trial court does not abuse its discretion by permitting the testimony of an undisclosed witness if it can be shown that the failure to provide discovery was not willful, that foreknowledge of the statement would not have benefitted the defendant in the preparation of the defense, and that the defendant was not prejudiced by the admission of the evidence. Heinish, supra, at 236.
The record does not indicate that the prosecutor willfully failed to disclose the existence of the witness. The issue of whether the officers' failure to obtain the prints was indicative of Montgomery's innocence did not arise until opening statements. Upon defense counsel's presentation of this theme, the prosecution was forced to carry the burden to produce evidence to the contrary.
Furthermore, we are not persuaded by Montgomery's argument that he would have benefitted from the advance notice of the existence of Lt. Moody. Montgomery argues that he would have been able to investigate his credentials, locate an expert to contradict his testimony, or omit the reference in his opening argument. However, defense counsel had initiated the prosecution's need for the testimony by making the failure of the officers to obtain prints from the baggie an issue of Montgomery's guilt or innocence.
As a final point, Montgomery does not claim that he was prejudiced by the prosecution's last minute production of Lt. Moody and his testimony. In fact, at trial, Montgomery objected not to the content of the testimony, but to the trial court's permission for Lt. Moody to testify during the prosecution's case in chief and not during its rebuttal. Montgomery also failed to request a continuance to voir dire the witness. Therefore, any error by the trial court in denying Montgomery's motion for a mistrial was harmless, and was not an abuse of discretion.
Montgomery's fourth assignment of error is not well-taken.
 VI. The court deprived the Appellant of his constitutional right to a fair trial through failing to declare a mistrial.
Based upon our decision in Montgomery's third and fifth assignments of error, we find that the trial court did not abuse its discretion in denying his motion for a mistrial. Montgomery's sixth assignment of error is overruled.
 VII. Errors occurring throughout these proceedings constitute cumulative error such that the convictions must be reversed.
In his final assignment of error, Montgomery argues that the cumulative effect of all errors made at trial deprived him of a fair trial and warrants a reversal of his convictions. As we recently stated in State v. Nelms (Feb. 25, 2000), Montgomery App. No. 17657, unreported,
 "Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial." State v. Fears (1999), 86 Ohio St.3d 329, 348. However, this doctrine is not applicable in instances where there is an absence of harmless and prejudicial error. State v. Garner (1995), 74 Ohio St.3d 49, 64; State v. Blankenship
(1995), 102 Ohio App.3d 534, 557.
In the preceding six assignments of error, Montgomery has claimed that various errors occurred. We find that Montgomery did receive a fair trial, and that any errors that did occur at trial or at the suppression hearing were not prejudicial, cumulatively as well as individually. Montgomery's seventh assignment of error is overruled.
As such, we affirm the judgment of the trial court.
 ___________________________ FREDERICK N. YOUNG, J.,
WOLFF, J. and FAIN, J., concur.