[Cite as *State v. Taylor*, 2012-Ohio-5421.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 98107

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# ALI TAYLOR

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-553483

**BEFORE:** Boyle, P.J., Celebrezze, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** November 21, 2012

**ATTORNEY FOR APPELLANT**

Craig J. Morice
P.O. Box 392
Wickliffe, Ohio   44092

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    James M. Rice
Assistant County Prosecutor
8th Floor Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

**{¶1}** Defendant-appellant, Ali Taylor, appeals his convictions for felonious assault and having a weapon while under a disability.   He raises three assignments of error for our review:

> [1.] The trial court abused its discretion in permitting the proffering and admission of state's exhibits 1.1 - 1.6 and 4 - 19 in contravention of Ohio Rules of Evidence 403, 602, and 1003.

> [2.] In light of the unfairly prejudicial evidence erroneously admitted against defendant/appellant, said evidence was insufficient as a matter of law to support the verdict and conviction rendered in the trial court.

[3.] The verdict and conviction entered against defendant/appellant was against the manifest weight of the evidence.

**{¶2}** Finding no merit to his appeal, we affirm.

Procedural History and Factual Background

**{¶3}** In August 2011, Taylor was indicted on three counts: two counts of felonious assault, in violation of R.C. 2903.11(A)(1) and (A)(2), with one- and three-year firearm specifications, and one count of having a weapon while under a disability, in violation of R.C. 2923.13(A)(2). The indictment arose from allegations that on the night of August 3, 2011, Taylor shot a 15-year-old male in the parking lot of a convenience store. The following facts were presented to a jury.

**{¶4}** The victim, T.W., testified that on the evening of August 3, 2011, he was at "C Town," a convenience store and deli, hanging out with some of his friends. A man, who appeared to be drunk, came up to one of T.W.'s friends and shook his hand. The man then "slapped" his friend, and his friend hit the man back. T.W. said that he was not really paying attention, but the "next thing he [knew]," the man had a gun in his hand and started shooting. T.W. said everyone took off running, including him, and he got shot in his buttocks. T.W. heard three shots. He ran to his aunt's house around the corner, and she called the police.

**{¶5}** T.W. testified that the shooter was "big" and was wearing a "black do-rag" and "jogging pants." He said the gun looked like a .38 revolver. He was not able to identify the shooter in a photo array. He testified that he did not know the shooter, did not talk to the shooter, and everything happened "too fast."

**{¶6}** Officer Troy Strong of the Cleveland Police Department testified that he responded to C Town, but was redirected to an apartment near there. He spoke with the victim, who gave him a description of the shooter. He and his partner went to C Town and viewed surveillance cameras from the store.

**{¶7}** Detective Ronda Gray testified that after she was assigned to the case, she learned about the surveillance video that was taken at C Town on the night of the shooting. She went to the store on August 5, 2011, to view the surveillance video. She testified that the video recording system "was quite an elaborate surveillance system," and had the capability to record DVDs, but the store manager did not know how to do it. The store manager also told her the video recording was on a loop and would record over the video, so she recorded the surveillance video with her cell phone as she watched it.

**{¶8}** Detective Gray explained that there were "quite a few frames" because there were several different camera views. She watched each of them and hit record every time she saw the suspect. She then emailed the videos on her cell phone to her supervisor, Sergeant Matt Putnam. Her supervisor told her that the videos were upside down on his computer, so she went back to the store on August 6 to re-record the surveillance video on her cell phone so that the video would not be upside down when viewing it on a computer.

**{¶9}** Detective Gray testified that she also showed the videos on her cell phone to Detective Ronald Berry. Detective Berry recognized Taylor from arresting him in the past. Taylor became a suspect at that point.

{¶10} Detective Gray viewed the state's exhibits 1.1 through 1.6 in court and identified them as the six segments of the videos that she took with her cell phone. She explained that the videos depicted the suspect going into the C Town store, walking around it, leaving, and then shooting at someone in the parking lot outside the store. She said the videos that were played in court were accurate as far as she remembered. She then identified still-frame photos that she explained were taken from the videos that she recorded.

{¶11} After Taylor became a suspect, Detective Gray learned that he had been arrested in Bedford several hours after the shooting at the C Town store. Detective Gray had Taylor transferred from the Bedford jail to the Cuyahoga County jail.

{¶12} Detective Gray explained on cross-examination that when she was recording the surveillance video with her cell phone, she hit reverse so that she could capture the suspect's face for a longer time. She further explained that she executed a search warrant at Taylor's mother's home, where Taylor also resided. She never found a gun or bullets in Taylor's mother's home.

{¶13} Detective Berry testified that on August 6, 2011, he viewed a video on Detective Gray's cell phone. The state played a video in court that Detective Berry identified as the same video that he viewed on Detective Gray's cell phone. Detective Berry said that when he saw the suspect in the video walk into the C Town store, he recognized him as Taylor. Detective Berry explained that he recognized Taylor because

he had arrested Taylor in the past. Detective Berry had "seen" Taylor "more than five times in the past," but said that it had been "about ten years or so" since the last time.

{¶14} Detective Berry identified a still-frame photo of Taylor walking into the C Town store. He explained that this was the same shot from the video where he had first identified Taylor on Detective Gray's cell phone. Detective Berry stated that the video that was played in court was just as he "remember[ed] seeing it" when he viewed it on Detective Gray's cell phone.

{¶15} Officer Val Closs of the Bedford Police Department testified that in the early morning hours of August 4, 2011, she responded to a call involving Taylor. She testified that she remembered that Taylor was wearing a blue striped shirt, dark pants, and a blue "do-rag." She was shown a still-frame photo of Taylor that according to Detectives Gray and Berry, shows him walking into the C Town store. Officer Closs stated that Taylor was wearing the same clothing when she picked him up around 2:00 a.m. on August 4. She further identified a booking photo of Taylor where he was wearing the same clothes except without the "do-rag." She explained that she had given the "do-rag" to Taylor's mother according to department policy.

{¶16} Mohammed Suleiman testified that he is the manager of C Town. He testified that he recognized Taylor as a customer at C Town. He said that Taylor used to be a regular customer and had been in C Town "[w]ell over 50 times."

{¶17} Suleiman testified that C Town has eight, "high quality" cameras; "two in the office, two in the front, one outside, two in the back and one on the side of the store."

He explained that the cameras record on a "36-hour loop," which meant that after 36 hours, the video automatically records over itself.

{¶18} Suleiman further explained that the videos are stored on a "DVR." He said that the DVR has the capability to record the videos with a DVD. He stated that police officers came to view the surveillance videos at the store and recorded them on a cell phone. He viewed the video in court and stated that it was a true and accurate depiction of the surveillance video that was recorded at his store on the night of the shooting.

{¶19} On cross-examination, Suleiman testified that he never made a statement to police officers until a few days before trial. He agreed on cross-examination that police officers never brought a DVD to record the surveillance video, despite that capability. He further explained that a police officer recorded the surveillance video on his cell phone on the night of the shooting. A female officer came back later and recorded it on her cell phone.

{¶20} The jury found Taylor guilty on all three counts and specifications. The trial court merged the felonious assault convictions and firearm specifications. It sentenced Taylor to eight years for felonious assault, three years for the firearm specifications, and three years for having a weapon while under a disability, for an aggregate sentence of 14 years in prison. The trial court further advised Taylor that he would be subject to three years of mandatory postrelease control upon his release from prison.

Evidentiary Issues

**{¶21}** In his first assignment of error, Taylor contends that the trial court erred and abused its discretion by admitting the duplicate recording (state's exhibits 1.1 through 1.6) and still-frame photos (state's exhibits 4 through 19) of the store's surveillance video because they were (1) unfairly prejudicial, (2) could not be authenticated, and (3) did not suffice as reliable "duplicates" of the original recording.

**{¶22}** The admission or exclusion of evidence lies in the trial court's sound discretion. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *See State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 16-18 (2d Dist.) citing *Black's Law Dictionary* 11 (8th Ed.Rev.2004). Further, this abuse of discretion must have materially prejudiced the defendant. *State v. Lowe*, 69 Ohio St.3d 527, 532, 634 N.E.2d 616 (1994), citing *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

**{¶23}** Taylor raises evidentiary issues relating to authentication and the best evidence rule. Evid.R. 901 provides for the authentication or identification of evidence prior to its admissibility. The rule provides, in pertinent part: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). By way of illustration, Evid.R. 901(B) provides that evidence may be properly authenticated by "testimony of witness with knowledge" that "a matter is what it is claimed to be."

**{¶24}** The common law "best evidence rule" in Ohio is codified in Evid.R. 1001 through 1008. It provides: "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules[.]" Evid.R. 1002. The "best evidence rule" rests on the fact that an original writing is more reliable, complete, and accurate as to its contents and meaning. *United States v. Holton*, 116 F.3d 1536, 1545 (D.C.Circ.1997).

**{¶25}** Evid.R. 1001(3) defines an original of a "writing or recording" as "the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it." Evid.R. 1001(4) provides that:

> A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original.

**{¶26}** Here, the videos and still-frame photographs taken from the surveillance video were duplicates of the original recording. Evid.R. 1003 governs the admissibility of duplicates, and provides: "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

**{¶27}** Further, the party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded. *State v. Tibbetts*, 92 Ohio St.3d 146, 160, 2001-Ohio-132, 749 N.E.2d 226. "The decision to admit duplicates, in lieu of originals, is one that is left to the sound discretion of the trial court." *State v. Easter*, 75

Ohio App.3d 22, 27, 598 N.E.2d 845 (4th Dist.1991).   In *State v. Barton*, 12th Dist. No. CA2005-03-036, 2007-Ohio-1099, ¶ 80, the court explained:

> When the party opposing the duplicate's admission raises a genuine question as to the duplicate's trustworthiness, the trial court must determine whether the testimony authenticating the duplicate is sufficient to convince the court "of the improbability of the original item having been exchanged with another or otherwise tampered with." [*Easter*] at 26.   The trial court's ruling on the sufficiency of authentication evidence is also reviewed under an abuse of discretion standard.   *Id.*

{¶28} Detective Gray testified that she went to the store and viewed the surveillance videos from the different cameras on a computer.   She explained that she recorded each video where she saw the suspect.   As she watched the videos, she recorded them with her iPhone.   She showed the recorded videos to Detective Berry on her cell phone; Detective Berry recognized Taylor from previous dealings he had with Taylor.   Detective Gray also emailed the videos on her cell phone to her supervisor.

{¶29} The state played the videos in court on either a television or a computer. During Detective Gray's testimony, she identified the videos as the same videos that she had recorded with her cell phone.   She further explained that the videos were accurate copies of the store surveillance videos.   The state also played the videos during Detective Berry's testimony.   Detective Berry stated that the videos were the same as the ones that he viewed on Detective Gray's cell phone.

{¶30} The state played the videos during the store manager's testimony as well; the store manager explained that the video portrayed what was recorded inside and outside of his store on the day of the shooting.   The store manager further testified that

the videos played in court were a true and accurate depiction of the surveillance video that was recorded at his store on the night of the shooting.

**{¶31}** Detective Gray sufficiently testified to satisfy the requirements under Evid.R. 901, as she had personal knowledge regarding both the original recording and the duplicate and was able to state that the duplicate correctly reproduced the original. Evid.R. 901(A) and (B)(1).

**{¶32}** Taylor argues that the trial court erred in admitting the videos because they were only "portions of the surveillance video taken by the digital recording system in place," and "were purportedly taken via Detective Gray's operating a cell phone video camera on at least two occasions."  But even Taylor concedes that despite these two facts, the videos and photographs were permissible "duplicates" under Evid.R. 1001(4). He argues, however, that "issues surrounding [the videos] making cast further doubt on their authenticity and reliability."

**{¶33}** First, Taylor implies that Detective Gray lied when testifying in court.  He states that Detective Gray testified that "she could not record from the digital video surveillance recording system in place at the C Town Deli onto a DVD," so she recorded it with her cell phone.  He asserts that the store manager's testimony contradicted Detective Gray's, because the store manager stated that the system was capable of recording the surveillance recordings onto a DVD.  Detective Gray, however, actually testified that the system *was* capable of recording onto a DVD, but that the store manager

did not know how to do it. The store manager's testimony does not contradict Detective Gray's testimony.

**{¶34}** Taylor next argues that Detective Berry, who identified Taylor, only viewed the videos on Detective Gray's cell phone, not on the computer as they were played in court. Detective Berry testified, however, that the videos that were played in court were the same videos that he viewed on Detective Gray's cell phone.

**{¶35}** Taylor further argues that the state did not establish the proper chain of custody for the videos and still-frame photos. He argues that Detective Gray's supervisor, Sergeant Putnam, did not testify, even though he is the one who received the emailed videos. Taylor further maintains that no one testified how the videos were transmitted, or how the still-frame photos were obtained from the videos.

**{¶36}** The chain of custody is part of the authentication and identification requirement in Evid.R. 901. *State v. Brown*, 107 Ohio App.3d 194, 200, 668 N.E.2d 514 (3d Dist.1995). The prosecution bears the burden of establishing a proper chain of custody. *State v. Moore*, 47 Ohio App.2d 181, 183, 353 N.E.2d 866 (9th Dist.1973). Chain of custody can be established by direct testimony or by inference. *State v. Conley*, 32 Ohio App.2d 54, 60, 288 N.E.2d 296 (3d Dist.1971). The state, however, has no duty to eliminate every possibility that tampering or substitution occurred. *Id.* The state must only show that it is reasonably certain that a substitution, tampering, or alteration did not occur. *Id.*

**{¶37}** We agree with Taylor that the state failed to establish a proper chain of custody with respect to the videos and still-frame photos. No one testified as to how the still-frame photos were obtained or how the emailed videos ended up with the state. Detective Gray testified that she emailed them to her supervisor, but she did not know how they were transmitted to the state.

**{¶38}** Nonetheless, we conclude that the state provided sufficient testimony from Detective Gray, Detective Berry, and the store manager that the videos were not altered or tampered with such that they should be deemed unreliable. Further, any break in the chain of custody goes to the weight afforded to the evidence, not to its admissibility. *Columbus v. Marks*, 118 Ohio App. 359, 194 N.E.2d 791 (10th Dist.1963); *State v. Mays*, 108 Ohio App.3d 598, 671 N.E.2d 553 (8th Dist.1996).

**{¶39}** We conclude that Taylor did not meet his burden to establish that the duplicate videos and still-frame photos should have been excluded as he did not raise genuine questions as to their trustworthiness. Accordingly, we decline to hold that the trial court's admission of the evidence was an abuse of discretion.

**{¶40}** Taylor's first assignment of error is overruled.

### Sufficiency and Manifest Weight of Evidence

**{¶41}** In his second and third assignments of error, Taylor argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

**{¶42}** When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶43}** In reviewing a claim challenging the manifest weight of the evidence,

> [t]he question to be answered is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

(Internal quotes and citations omitted.) *Leonard* at ¶ 81.

**{¶44}** With respect to Taylor's sufficiency argument, he concedes that if we find that the trial court properly admitted the videos and still-frame photos, that the state presented sufficient evidence such that any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. Because we concluded that the trial court properly admitted that evidence, Taylor's sufficiency argument is without merit.

**{¶45}** Regarding manifest weight of the evidence, Taylor again claims that the the videos and still-frame photos were "fatally defective." In addition to that argument, Taylor asserts that no other evidence corroborated that he was even at the store. He

contends that the victim could not identify him, and the store manager did not hear a shooting take place outside of his store. We disagree.

{¶46} Detective Gray showed the surveillance video to Detective Berry. Although it had been over ten years, Detective Berry testified that he recognized Taylor from previous dealings. After Taylor became a suspect, Detective Gray discovered that he had been arrested in Bedford a few hours after the shooting at the C Town store.

{¶47} The Bedford police officer who arrested Taylor testified that he was wearing a dark blue striped shirt, a blue "do-rag," and dark jeans when she arrested him. When showed a photo of Taylor in the C Town store, the Bedford police officer testified that he was wearing those exact same clothes when she arrested him. The Bedford officer further identified a booking photo of Taylor wearing the same striped shirt and pants, but not the "do-rag." She explained that she gave it to Taylor's mother, along with some of Taylor's other belongings.

{¶48} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the credibility of witnesses, and resolving conflicts in the evidence, we conclude that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Thus, Taylor's arguments regarding manifest weight of the evidence are overruled.

{¶49} Accordingly, Taylor's second and third assignments of error are overruled.

{¶50} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., and
EILEEN A. GALLAGHER, J., CONCUR