[Cite as *State v. Hoskin*, 2019-Ohio-1987.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO

      Plaintiff-Appellee,        :

                                                         :            No. 107315

      v.                      :

THOMAS HOSKIN,           :

      Defendant-Appellant.    :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 23, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-624329-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brad Meyer, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} Defendant-appellant, Thomas Hoskin, appeals his conviction. He raises three assignments of error for our review:

1. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the conviction.

2. Appellant's conviction is against the manifest weight of the evidence.

3. The trial court erred by admitting the body cam video of the surveillance video and by denying appellant's motion to dismiss where the state failed to produce the original video surveillance.

{¶ 2} Finding no merit to his arguments, we affirm.

## I.    Procedural History and Factual Background

{¶ 3} Hoskin was indicted in December 2017 on four counts, including one count of aggravated robbery in violation of R.C. 2911.01(A)(1), one count of kidnapping in violation of R.C. 2905.01(A)(2), and two counts of having a weapon while under disability in violation of R.C. 2923.13(A)(2) and (3). The aggravated robbery and kidnapping charges carried one- and three-year firearm, notice of prior conviction, and repeat violent offender specifications. The weapons disability under R.C. 2923.13(A)(2) carried one- and three-year firearm specifications. Hoskin waived his right to a jury trial and the matter proceeded to a bench trial, where the following evidence was presented.

{¶ 4} Dominic Mason testified that in December 2017, he was living in Wellington, Ohio, about 45 minutes south of Cleveland. On the night of December 15, 2017, Mason came to Cleveland to spend the night because he had a

recording session in Beachwood the following afternoon. Mason explained that he is a musician who performs "R and B, hip hop" all over the United States. He rents space at the recording studio approximately two times per month. On this particular night, he and his girlfriend, Azra Celic, went to a bar in Euclid because it was his friend's birthday.

{¶ 5} After they left the bar, they were searching for a motel to spend the night. He said that they searched Google and found the Cleveland Motel. When they arrived around 2:00 a.m, he noticed the motel was kind of "rundown." Celic went inside the office to get a room. When she came back, Mason said that a woman approached their car and asked them if they had a lighter. Celic gave the woman a lighter, and then the woman began asking them where they were from. At first, Mason did not think anything of it, but then a black Jeep pulled into the parking lot. The woman went to talk to the people in the black Jeep, and then also spoke to a couple of other people in other vehicles. The woman then came back to their car and gave Celic her lighter.

{¶ 6} Mason said that he and Celic had a "weird feeling" about the motel because there was "too much activity going on outside." It made them feel uncomfortable. They decided to go to Taco Bell, hoping that it would be better when they returned. When they came back to the motel, there was a male walking who called out to them as they parked the car. The male was later identified to be Hoskin. Hoskin walked up to their car and began to ask them questions. Mason said that Hoskin asked him, "Aren't you the guy from the green house?" Mason told Hoskin

that he was not from around that area.  Hoskin walked away, and they went into their motel room.

{¶ 7} Mason testified that Celic forgot a bag in the car, so he went out to get it.  Mason testified that when he walked outside, "a guy yelled down" to him.  It was Hoskin.  Mason walked to the place where Hoskin was standing, which was "maybe a few rooms down."  Mason talked to Hoskin because he thought that Hoskin might have recognized him from his music.  Instead, Mason testified that Hoskin told him that "this isn't a good neighborhood" and that Hoskin "kept going on and on about [Mason] needed protection and that [they] needed to pay for protection to be there."  Mason stated that he knew that Hoskin was telling him that if he did not pay for protection, that "something bad" would happen to them.

{¶ 8} Mason testified that Hoskin asked Mason "if [he] was carrying."  Mason said that Hoskin told him that he had gun on him and "gestured as if he was carrying a gun in his pocket," but Mason never saw a gun.  Mason told Hoskin that he did not have "anything" on him.  Hoskin made Mason lift his coat, which Mason did to show him that he did not have a gun on him.  Hoskin then "turn[ed] [Mason] around" and made him walk back to his motel room.  Mason said that Hoskin came into their motel room and told Mason to empty his pockets, which Mason did.  Mason said that he emptied his pockets when Hoskin told him to because he "feared for the safety of [himself] and his girlfriend."  Mason "felt threatened" and thought that Hoskin "had a small pistol in his pocket."  Mason gave Hoskin money, "like 50 bucks or something like that."  Mason stated that he also gave Hoskin a ticket to his

show in Cleveland, telling Hoskin that he was a performer and an artist.  When asked why he did so, Mason said that was "the only other thing [he] had on him."  Hoskin then left their room and told them that they would "be protected."

{¶ 9}    After Hoskin left, Mason called the police, and Celic called the front office to ask for a refund for their room.  Mason said that when Celic told the front-desk person that they were calling the police because they had been robbed, the person "got on a bullhorn."  The front-desk person asked Celic what their room number was, and when she told the front-desk person what it was, Mason said that he could hear someone announcing "everything over a bullhorn," including their room number and that they were calling the police.  Mason said that after he heard that, he "was really, really nervous, [and] really scared."

{¶ 10}  Mason's 911 call was played in court.  Mason said that when he called 911, he did not know what was going on outside.  Mason did not want to give the 911 operator their room number at first after he heard the announcement over the "bullhorn."  Mason said that he did not know who he could trust at that point because of what the front-desk person did over the loud speaker.  Mason called 911 a second time "because there was so much commotion going on outside and [he] was nervous."  When police arrived, Mason was afraid to go outside at first.  They eventually went outside to talk to police.  He said that he put his "hood" up so that no one would see who he was.  He identified Hoskin as the man who robbed him.  He also went back to their room with police to record a statement.  Mason said that he and his girlfriend left and went to another hotel.

{¶ 11}  On cross-examination, Mason admitted that when he went outside to get Celic's bag out of the car, no one made him walk over to where Hoskin was standing.  Mason agreed that he told the 911 operator that the man had a gun, but he did not tell police this fact when they arrived.  He further agreed that he did not initially give his name or room number to the 911 operator.

{¶ 12}  Mason stated that after the manager announced that "the guy that you guys just robbed * * * [is] calling [the] police," he heard "doors opening and shutting outside," and he "literally had * * * [his] foot against the door and his hand against the door because he did not know if they were going to rush in there after the owner just announced that we had called the police."  He said that he did tell police that he gave Hoskin a ticket to his show because he was worried that Hoskin might show up at the show.  Mason said that he had "extra security" at his show when he performed that night.

{¶ 13}  Celic testified to the same version of events that Mason had.  Additionally, Celic stated that when Mason was emptying his pockets onto the bed, Hoskin was saying to him, "Yeah, everything you got, just everything you got."  She said that Mason pulled the money out and was "super calm, super chill, just acted like nothing was seriously wrong."  Hoskin said, "This is how you get protection," and Mason "just played it cool."  Celic stated that she saw Mason hand Hoskin a ticket to his upcoming show in Cleveland and say, "Oh, come to the show."  Celic testified that Mason was "trying to be cool."  After Hoskin left, Mason shut the door, locked it, and told Celic to call the front desk while he called 911.

{¶ 14} Celic stated that when she called the front desk, the person refused to give their money back. She said that when the front-desk person was asking her what her room number was, she heard an "echo almost." Celic said that she got closer to the window so that she could hear what was happening outside. When the front-desk person asked her again what room she was in, Celic stated that it sounded like someone was on an intercom outside when he asked the question. Celic "freaked out" and hung up the phone.

{¶ 15} Celic testified that after police arrived, they lined up several people outside against a wall for them to identify. She explained that her vision is not very good, so she had to go right up to the people's face and look very closely at them. When she was face to face with the people, she told police that she could not identify anyone. Celic then pulled a female police officer to the side, however, and identified Hoskin as the one who robbed them.

{¶ 16} Celic and Mason denied that Mason performed for Hoskin in their motel room.

{¶ 17} Officer Gary Kane testified that he was working on the morning of December 16, 2017. He received a report that a male had been robbed at the Cleveland Motel by a "black male who was wearing a black skullcap and a gray jacket or hoodie." When he arrived at the motel, he saw a black Jeep that had been mentioned by dispatch. There were several people standing near the Jeep. Officer Kane made the people line up against the wall. He saw a male who matched the description of the suspect trying to walk away from the group toward a small hallway

that led to three or four additional motel rooms "hidden in that hallway." Officer Kane stated that the suspect appeared to be trying to get away from them, but listened to Officer Kane when he told him to come back.

{¶ 18} Officer Kane went to the victim's room to speak with him. Officer Kane then went to the front office to view the motel's security cameras. Officer Kane testified that employees at the Cleveland Motel are not usually cooperative with police. He stated, "We're usually given a story that they can't access them or they can't allow us in at the time." This time, however, the person working there allowed Officer Kane to view the video. When Officer Kane viewed the motel's surveillance footage, his body camera recorded it. Officer Kane stated that he attempted to secure a copy of the actual motel footage, but was unable to do so. The recording of Officer Kane's body camera was played in court and admitted into evidence.

{¶ 19} Officer Kane explained that when he was watching the surveillance footage, he "fast forwarded" through parts that were not relevant. Because of this, Officer Kane could not say how long Hoskin was in Mason's room.

{¶ 20} Officer Kane further testified that he and other officers lined up the people who had been standing around the Jeep when they arrived for Mason and Celic to identify the male who robbed Mason. Both Mason and Celic were able to identify Hoskin as the man who came into their room and took Mason's money. Hoskin did not have any money on him when police arrested him.

{¶ 21} At the close of the state's case, Hoskin moved for a Crim.R. 29 acquittal, which the trial court denied.

**{¶ 22}** Hoskin testified that when he first saw Mason in the parking lot of the Cleveland Motel, he asked him, "Aren't you the guy I seen earlier at the green house on Outhwaite?" Hoskin explained that people go to the "green house" to get heroin. Hoskin said that Mason told him "no" and that he did not know what Hoskin was talking about. Hoskin stated, "You know, he kind of act, you know, sketchy." Hoskin said that he apologized and walked away from Mason.

**{¶ 23}** Hoskin testified that he later saw Mason come out of his motel room and gestured toward Hoskin and started walking toward Hoskin, so Hoskin began walking toward Mason. Hoskin said that Mason apologized at first for how he acted when Hoskin asked him if he had been at the "green house." Hoskin stated that he told Mason, "It's no problem." Hoskin then said that Mason told him that he was "here with my girl" and that they were "looking to party." Hoskin asked, "Okay. What you looking for?" Mason told him that he was looking "for some hard," which is crack cocaine. Mason also told him that he had $30 in his room. Hoskin testified that he needed to make sure that Mason did not have a gun on him, so he asked Mason to open his coat up so that he could check for weapons. Hoskin told Mason that he had the drugs on him, but that he could not show him there because of cameras. Mason told him to "come on" because the money was in his room. Hoskin followed Mason to his room.

**{¶ 24}** Hoskin said that he had his hands in his pockets because it was cold. Hoskin said he never told Mason that he needed protection. Hoskin stated that he never told Mason that he had a gun.

{¶ 25} Hoskin said that once they got to Mason's room, Mason started looking all around for his money, but could only find $12. Hoskin said that for $12, he gave Mason five pieces of crack cocaine. Hoskin said that Mason was upset with how much Hoskin gave him because he had wanted more.

{¶ 26} Hoskin testified that before he left Mason's room, Mason told Hoskin to "check [him] out" because he was a rapper. Mason handed Hoskin a ticket to his show. Hoskin stated that he "didn't want the ticket," but he took it. Hoskin said that Mason told him that it was a $20 ticket. Hoskin replied, "I'm not going to use it." Hoskin said that Mason had a whole stack of tickets, which were on a table by the door. Hoskin said that he was trying to get out the door, not really listening to Mason. Hoskin stated that he was "jonesing," "running," and "high," so he wanted to leave. But then Mason started "rapping * * * a couple of bars * * * like, two, three bars." Hoskin said that Mason "was actually kind of good." Hoskin described Mason as a "political, conscious rapper." Hoskin stated that Mason's girlfriend had an uncomfortable look on her face, "like just let that dude leave."

{¶ 27} Hoskin denied that he took Mason's money by force.

{¶ 28} When Hoskin left Mason's motel room, he went to the dealer in the parking lot, gave him the money, and the dealer gave him a piece of crack. He then took one dollar and bought a bag of chips in the motel lobby. He also bought a "Black and Mild cigar." He then went back outside to "make runs."

{¶ 29} When the police came, Hoskin stated that he tried to walk away because he had a "stem" in his pocket, as well as a piece of crack in his mouth. He

explained that "stem" was a "slang term" for "smoking utensil [or] pipe." Hoskin said that he tried to walk down this hallway away from the police "to get rid of the stem" so that he did not have drug paraphernalia on him.

{¶ 30} When the police arrested Hoskin and placed him in the back of a police cruiser, he told a police officer, "If I robbed this guy, why would he give me a ticket to [his] show?" He told the officer to "please go in there and search his room" because he would find drug paraphernalia and a stack of tickets. Hoskin said that if he was going to rob Mason, he would have taken the tickets to sell them. He further told the officer to look at the motel video and he would see that it was Mason who initiated the conversation when he came out of his motel room. Hoskin stated that the video would have supported his version of the events. Hoskin gave police the concert ticket that Mason had given him and told the officers that he wanted the ticket "on record" to prove that Mason had given him the ticket. Hoskin further told police that Mason told him that he had a show on January 5 and that he should "come down, hang out with us, and drink with us."

{¶ 31} Hoskin testified that when someone came over the loud speaker saying "somebody called the police," he did not try to leave.

{¶ 32} The trial court found Hoskin guilty of third-degree felony robbery under R.C. 2911.02(A)(3), a lesser included offense of aggravaged robbery, finding that the state proved beyond a reasonable doubt that in attempting to or committing a theft offense or in fleeing immediately after an attempt or offense, that Hoskin did use or threaten the immediate use of force against another. The trial court dismissed

the firearm specifications and found that Hoskin was not guilty of kidnapping or the weapons-disability counts.

{¶ 33} The court stated that in coming to this conclusion, the video did not "help the finder of fact" because it could corroborate either version of the events. The court stated that the video "really adds nothing to it." The court explained that what "adds weight to the testimony in this case is the unreasonableness" of what Hoskin testified to. The court stated that "for instance," Hoskin testified that an amicable drug transaction took place and that when he left, "they were completely satisfied." But the court stated that does not explain what took place next; the fact that Mason and Celic called the police and reported that they were robbed. The court found that Hoskin's version "just did not make sense."

{¶ 34} The trial court sentenced Hoskin to 36 months in prison and notified him that he would be subject to a discretionary period of three years of postrelease control upon his release from prison. The court found Hoskin to be indigent and waived court costs. It is from this judgment that Hoskin now appeals.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 35} In his first and second assignments of error, Hoskin contends that the state failed to present sufficient evidence that he was guilty of robbery beyond a reasonable doubt and that his robbery conviction was against the manifest weight of the evidence. We will address these assignments of error together for ease of discussion.

{¶ 36} When assessing whether the evidence presented at trial was sufficient to sustain a conviction, an appellate court reviews that evidence in a light most favorable to the prosecution to determine whether such evidence, if believed, would convince a rational trier of fact of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The proper inquiry is not whether the prosecution's "evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Accordingly, a challenge to the sufficiency of the evidence tests whether the prosecution has met its burden of production at trial. *Id.* at 390.

{¶ 37} On the other hand, a manifest-weight challenge tests whether the prosecution has met its burden of persuasion. *Id.* On review from a manifest weight challenge, the appellate court is tasked with reviewing all of the evidence in the record and in resolving the conflicts therein, determining whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at 387. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.* Moreover, this court recognizes that the "weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the fact[.]" *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 73, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶ 38} Hoskin was convicted of robbery in violation of R.C. 2911.02(A)(3), which provides as follows: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [u]se or threaten the immediate use of force against another." There was not actual force involved here. Thus, the question presented in this case is whether there was sufficient evidence that Hoskin used the threat of immediate use of force to take Mason's money.

{¶ 39} The Ohio Supreme Court has held:

> The use or threat of immediate use of force element of the offense of robbery * * * is satisfied if the fear of the alleged victim was of such a nature as in reason and common experience is likely to induce a person to part with property against his will and temporarily suspend his power to exercise his will by virtue of the influence of the terror impressed.

*State v. Davis*, 6 Ohio St.3d 91, 451 N.E.2d 772 (1983), paragraph one of the syllabus.

{¶ 40} Courts have also held that a defendant's actions and demeanor may support a finding of a threat of force. *State v. Bentley*, 69 Ohio App.3d 33, 36, 590 N.E.2d 21 (9th Dist.1990), citing *State v. Carter*, 29 Ohio App.3d 148, 150, 504 N.E.2d 469 (9th Dist.1985). The threat of violence, compulsion, or constraint need not be direct and explicit. *State v. Bush*, 119 Ohio App.3d 146, 150, 694 N.E.2d 984 (2d Dist.1997). With respect to whether a criminal defendant charged with robbery has threatened an immediate use of force, "evidence of whether the victim actually perceived a threat is not necessary; evaluation of the nature of a threat is subject to an objective, not subjective, test." *State v. Sumlin*, 8th Dist. Cuyahoga No. 76261,

2000 Ohio App. LEXIS 2635, 5 (June 15, 2000), citing *Davis* at 94; *State v. Habtemariam*, 103 Ohio App.3d 425, 429, 659 N.E.2d 850 (10th Dist.1995). The test for force or threat of force is based on the totality of the circumstances. *Habtemariam* at 429.

{¶ 41} Viewing the totality of the circumstances in this case, we find that the evidence supports a finding under the objective test that Hoskin stole Mason's money by threatening him with the immediate use of force. In other words, it does not matter whether Mason actually perceived a threat of force. The test is whether a reasonable person would have perceived one. The state presented evidence that when Mason went back outside to get Celic's bag that she had forgotten in the car, Hoskin called Mason over to him, which was a few doors down from Mason's motel room. Hoskin was the one who had walked up to their car when they got back from Taco Bell and asked Mason if he was the "guy from the green house." Hoskin told Mason that this was not a "good neighborhood," and that Mason needed to "pay for protection" or "something bad" would happen to them. Hoskin then told Mason that he had a gun on him. Mason stated that Hoskin also had one of his hands in the pocket of his "hoodie" and that it looked like Hoskin had a gun in his pocket. Hoskin made Mason lift his jacket up so that Hoskin could see if Mason had a gun on him. Hoskin then "turned [Mason] around" and made him walk to his room. Once they were inside the room, Hoskin made Mason empty his pockets. Celic testified that as Mason was emptying his pockets, Hoskin kept saying, "Yeah, everything you got, just everything you got," and "[t]his is how you get protection."

{¶ 42} The totality of this evidence, if believed, was sufficient to establish the element of a threat of the immediate use of force. Thus, we find that the state met its burden of production and presented sufficient evidence that Hoskin committed robbery beyond a reasonable doubt.

{¶ 43} The more difficult question in this case, however, was who to believe. As the trial court stated, the video could support either Hoskin's version of the events or the victims' version. But after reviewing all of the evidence in this case and in resolving the conflicts present, we cannot say that the trial court as the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We agree with the trial court that Hoskin's testimony regarding what occurred outside of Mason's motel room could have been equally as plausible as Mason's version of what occurred. Hoskin and Celic could have been looking to "party" as Hoskin testified to and asked Hoskin for drugs. Further, Hoskin's, Mason's, and Celic's testimony are very consistent regarding many aspects of what occurred. It is only what occurred inside Mason's and Celic's room and more significantly, what occurred after Hoskin left the victims' room, that weighs in the victims' favor. Hoskin testified that he sold Mason five pieces of crack cocaine and that the two were friendly with each other. But if that were true, why would Mason call 911 and Celic call the front desk as soon as Hoskin left their motel room and report that they had just been robbed? Hoskin's version of the events falls apart at this point.

{¶ 44} Accordingly, we conclude that Hoskin's robbery conviction is not against the manifest weight of the evidence. This is simply not the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387.

{¶ 45} Hoskin's first and second assignments of error are overruled.

### III. Body Cam Video of the Surveillance Footage

{¶ 46} In his third assignment of error, Hoskin contends that the trial court erred when it admitted Officer Kane's body camera recording that included portions of the motel's surveillance footage.

{¶ 47} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). The Ohio Supreme Court has defined "abuse of discretion" as an "unreasonable, arbitrary, or unconscionable use of discretion, or as a view or action that no conscientious judge could honestly have taken." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67. Further, this abuse of discretion must have materially prejudiced the defendant. *State v. Lowe*, 69 Ohio St.3d 527, 532, 634 N.E.2d 616 (1994), citing *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

{¶ 48} Hoskin argues that trial court's admission of the "duplicate copy" of the surveillance footage violated Evid.R. 901 and 1001. Evid.R. 901(A) provides, in pertinent part, that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(B)

provides that evidence may be properly authenticated by "testimony of witness with knowledge" that "a matter is what it is claimed to be."

{¶ 49} The common law "best evidence rule" in Ohio is codified in Evid.R. 1001 through 1008. It provides, "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules[.]" Evid.R. 1002. The "best evidence rule" rests on the fact that an original writing is more reliable, complete, and accurate as to its contents and meaning. *United States v. Holton*, 116 F.3d 1536, 1545 (D.C.Cir.1997).

{¶ 50} Evid.R. 1001(3) defines an original of a "writing or recording" as "the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it."

{¶ 51} Evid.R. 1001(4) provides:

A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original.

{¶ 52} Officer Kane recorded the motel's surveillance footage with his body camera. Thus, the body camera footage was a duplicate of the original recording.

{¶ 53} Evid.R. 1003 governs the admissibility of duplicates, and provides: "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

{¶ 54} Further, the party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded. *State v. Tibbetts*, 92 Ohio St.3d 146, 160, 749 N.E.2d 226 (2001). Just as with other evidentiary issues, "[t]he decision to admit duplicates, in lieu of originals, is one that is left to the sound discretion of the trial court." *State v. Easter*, 75 Ohio App.3d 22, 27, 598 N.E.2d 845 (4th Dist.1991).

{¶ 55} In *State v. Barton*, 12th Dist. Warren No. CA2005-03-036, 2007-Ohio-1099, ¶ 80, the court explained:

> When the party opposing the duplicate's admission raises a genuine question as to the duplicate's trustworthiness, the trial court must determine whether the testimony authenticating the duplicate is sufficient to convince the court "of the improbability of the original item having been exchanged with another or otherwise tampered with." [*Easter*] at 26. The trial court's ruling on the sufficiency of authentication evidence is also reviewed under an abuse of discretion standard. *Id.*

{¶ 56} Officer Kane testified that he went to the motel's front office to view the surveillance footage. He explained that there were different camera angles, but that he only recorded one with his body camera because it showed everything he needed to see. During Officer Kane's testimony, he stated that the video was a true and accurate copy of what the surveillance footage showed.

{¶ 57} The state played the body camera footage of the surveillance video during Mason's testimony too. Mason identified himself in the footage as the state played it, stopping it for Mason to explain what is happening during different parts

of the footage. Mason explained that the video showed exactly what occurred that night.

{¶ 58} Officer Kane's testimony sufficiently satisfied the requirements under Evid.R. 901, as he had personal knowledge regarding both the original recording and the duplicate and was able to state that the duplicate correctly reproduced the original. Evid.R. 901(A) and (B)(1). Mason's testimony further shows that the surveillance footage is what occurred that night and is what it appears to be.

{¶ 59} Hoskin further argues that the video footage is not accurate regarding time frames because parts of the video were "sped up." But even during Hoskin's own testimony, Hoskin's counsel played portions of the video again while Hoskin testified to it. Hoskin did not claim that the video did not depict what had occurred. Indeed, Hoskin testified that it showed exactly what he testified to regarding his interactions with Mason. When Hoskin's counsel attempted to show part of the video where Hoskin was inside Mason's room and he claimed that it was "sped up" because Hoskin was "really in there longer than what's depicted on [the] tape," Hoskin agreed that he may have been in the room "a couple minutes" longer than what is depicted in the video. But Hoskin did not testify that the video did not depict what occurred either before or after he went into Mason's room. We further note that even if Hoskin was in Mason's room "a couple of minutes" longer than depicted on the video, we find no prejudice to Hoskin because it does not change the fact that as soon as he left Mason's room, Mason called 911 and Celic called the front office, both claiming that they had just been robbed.

{¶ 60} Hoskin also contends that his due process rights were violated because the state failed to preserve the original video surveillance footage after he told police that the footage would prove that he did not commit robbery. He further maintains that this was a Crim.R. 16 violation. We disagree with both arguments.

{¶ 61} First, Hoskin does not argue how the original surveillance footage would have exonerated him. Indeed, he agreed at trial that the video footage portrayed what occurred that night. He just disagrees with Mason's version of what the two were saying when the footage was being recorded. Thus, we find no due process violation when Hoskin cannot show that the evidence would have been exculpatory.

{¶ 62} Further, there cannot be a Crim.R. 16 violation of a duty to disclose when the state never had evidence to disclose in the first place. Crim.R. 16 requires the state to provide copies of items related to discovery for the defense. The rule does not require the state to obtain items requested by the defense that the state does not already possess. *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 51.

{¶ 63} Moreover, this court faced a very similar issue in *State v. Taylor*, 8th Dist. Cuyahoga No. 98107, 2012-Ohio-5421. In *Taylor*, a police officer recorded surveillance footage from a convenience store with her cell phone. The defendant argued that the trial court erred when it admitted a duplicate copy of surveillance footage, claiming it violated Evid.R. 901 and 1001. This court upheld the admission of the cell phone recording of the video surveillance, finding that the state presented

sufficient evidence that the surveillance footage was not altered or tampered with such that it should be deemed unreliable. *Id.* at ¶ 38. Like *Taylor*, we find there is no evidence in this case that the officer's body camera recording of the motel's video surveillance footage was unreliable.

{¶ 64} Accordingly, we overrule Hoskin's third assignment of error.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
RAYMOND C. HEADEN, J., CONCUR