[Cite as *State v. Williams*, 2021-Ohio-3317.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

      Plaintiff-Appellee,                    :                      No. 20AP-145
                                      (C.P.C. No. 18CR-5101)

v.                                                           :

                                     (REGULAR CALENDAR)

Stephen D. Williams,                            :

      Defendant-Appellant.                :

---

D E C I S I O N

Rendered on September 21, 2021

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Michael P. Walton*, for appellee.

**On brief:** *Stephen T. Wolfe*, Wolfe Law Group, LLC, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas.

SADLER, J.

{¶ 1} Defendant-appellant, Stephen D. Williams, appeals from the judgment of the Franklin County Court of Common Pleas convicting appellant of three counts of felonious assault, each with a three-year firearm specification, and one count of improper handling of a firearm. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On the night of October 5, 2018, Mohammad Ghaidan ("Ghaidan"), Kahlid Qutifan ("Qutifan"), and Fathe Hamed ("Hamed") were working at JR Junior's Drive Thru in Columbus, Ohio. Around 11:00 p.m., appellant pulled into the drive thru, driving a dark colored Mazda, and asked to purchase alcohol. Ghaidan could smell alcohol coming from appellant. Qutifan refused to sell alcohol to appellant because of his intoxicated state.

Appellant got out of the car, arguing with Qutifan, and the argument escalated into a physical altercation. Ghaidan told appellant to get back in the vehicle and leave.

{¶ 3}   Appellant got back in his car, pulled out of the drive thru, and stopped the car in the parking lot. He exited his car and fired two or three shots towards the drive thru, hitting a cooler next to where Ghaidan was standing. Appellant got back in his car and drove away.

{¶ 4}   Ghaidan called the Columbus Police, who arrived at the scene at 11:12 p.m. The officers processed the scene. Officer Daniel Schlaegel ("Officer Schlaegel") found shell casings in the parking lot. Officer Schlaegel believed the casings were new since they were not rusted or crushed, and still shined.

{¶ 5}   The business is equipped with a video surveillance system, which erases its contents every day at 12:00 a.m. Not all of the eight cameras captured the incident. Qutifan showed the officers "all the angles where they could see the actual incident happen." (Dec. 11, 2019 Tr. at 475.) Qutifan also described the action and identified the shooter on the video to the police that night. The officers reviewed the tape and recorded portions of the content depicting appellant's conduct that evening on cellphones. Officer Schlaegel identified the license plate information from the surveillance video. The license plate was registered to a dark colored Mazda owned by the appellant.

{¶ 6}   The officers went to the address listed for appellant. The appellant was not home but arrived shortly thereafter and was taken into custody. Detective Ronald Lemmon ("Detective Lemmon") conducted a gunshot primer residue test on appellant's hands, which revealed a particle characteristic of gunshot primer residue on appellant's left hand. While in custody, appellant admitted he had been at the drive thru and knew why the officers were looking for him.

{¶ 7}   On October 15, 2018, appellant was indicted with three counts of felonious assault, each with a three-year firearm specification, and one count of improper handling of a firearm. Appellant entered a plea of not guilty. The matter proceeded to a jury trial. Appellant filed a motion in limine to exclude the cellphone video of the surveillance system from that night, which was overruled by the trial court. The appellant renewed the motion several times before and during trial, each of which were denied by the trial court.

{¶ 8}    During trial, all three victims testified, as well as Officer Schlaegel, the patrol officer who processed the scene the night of the incident; Detective Bradley Morrow ("Detective Morrow"), the detective who processed appellant's car following his arrest; Detective Peter Pappas, the detective who investigated the scene the night of the incident; Detective Lemmon, the detective who conducted the gunshot residue test on appellant the night of the incident; Donna Schwesinger, the trace analyst from BCI who tested the gunshot residue kit submitted by Detective Lemmon; and Hunter Leeport, appellant's co-worker and friend who appellant had seen that evening before the incident.  Appellant did not testify.

{¶ 9}    Ghaidan testified that, on the night of the incident, appellant arrived at JR Junior's Drive Thru and spoke with Qutifan when he first pulled in.  Appellant and Qutifan began to argue.  Ghaidan approached the car and saw a gun on the front passenger seat.

> Q.      * * * What did you see?
> A.      Gun.
> Q.      Where was that gun?
> A.      Right next to the passenger * * * beside him * * * Like
>         right here in the front seat[.]

(Dec. 11, 2019 Tr. at 278-79.) Appellant then exited the car and the men began to fight physically.  Ghaidan stated he tried to break up the fight and told appellant to leave.  Appellant returned to his car and pulled out of the drive thru and into the parking lot.  Ghaidan stated, at the time of the shooting, he was standing inside by a cooler where one of the bullets hit.  Ghaidan said he heard "[t]wo or three" shots fired.  *Id.* at 303.  He testified that he did not look outside, but looked towards Qutifan and Hamed, who were also inside the drive thru, to make sure they were fine.  On cross-examination, Ghaidan testified that he was able to see both Qutifan and Hamed out of one eye and the first shot being fired out of his other eye.  Qutifan stated he moved into the office area after the first shot.

{¶ 10} Qutifan testified that after the altercation he proceeded into the office area, where he watched through a window in the display case and saw appellant step out of his car and start shooting.  Qutifan grabbed his dad's gun and ducked down.  Qutifan testified that he never fired his gun.  On cross-examination Qutifan elaborated on what he witnessed, stating "when the shooting did occur and I did hear the shooting, that's when I

reached for my gun.  By the time I turned around he was walking away * * * but I did see the weapon and I did hear the actual gun fire."  *Id.* at 492.

{¶ 11}  Hamed testified that he did not see the shots, but that he heard the shots and saw a bullet on the floor.  Hamed also identified appellant as the shooter during the trial.

{¶ 12}  Officer Schlaegel testified that he arrived at the scene and immediately noticed new, spent shell casings in the parking lot. Officer Schlaegel spoke with the victims and reviewed the surveillance video footage, identifying the license plate number of appellant's vehicle.  Around 12:30 a.m., Officer Schlaegel proceeded to appellant's house and knocked on the door.  Appellant was not home but arrived shortly thereafter.  Officer Schlaegel apprehended appellant at 12:37 a.m. and testified that he could smell alcohol on appellant.  Detective Lemmon testified that he conducted a gunshot residue test on both of appellant hands, which happened around 1:56 a.m.

{¶ 13}  On December 13, 2019, the jury returned a verdict of guilty on all charges and specifications.  The trial court sentenced the appellant to a total term of ten years.  Appellant timely appealed.

## II.  ASSIGNMENTS OF ERROR

{¶ 14}  Appellant assigns the following as trial court error:

> [1.] The trial court erred when it allowed the admission of edited videos over counsel's objection.
>
> [2.] The jury's verdicts were against the manifest weight of the evidence.

## III.  LEGAL ANALYSIS

### A.  Appellant's First Assignment of Error

{¶ 15}  In appellant's first assignment of error, he argues that the trial court erred when it allowed admission of "edited videos" over counsel's objections.  Appellant argues the video footage produced was "not a 'duplicate' because it [did] not accurately reproduce the original."  (Oct. 18, 2020 Appellant's Brief at 7.)  The appellant states, the police did not "attempt to download the videos, they just simply recorded a few, short snippets with a cell phone camera."  *Id.* at 7.[1]  Appellant admits the recording "may accurately reproduce a

---

[1] Evidence was presented regarding the system's erasure of the footage at midnight, including Qutifan's testimony that the system deletes the footage "every night, I think midnight, 12:00" and the footage cannot then be retrieved.  (Dec. 11, 2019 Tr. at 476).  Detective Pappas testified that downloading video from a server

small portion," but argues, "video surveillance is something that must be viewed as a whole" and "admitting a truncated copy would not be fair." *Id.* at 7-8.

{¶ 16} Appellee asserts that "there is no evidence whatsoever that any of the three videos were 'edited' in any manner by anyone. The content of the video was not changed in any manner. * * * [T]he videos were not edited or otherwise manipulated by anyone." (Jan. 19, 2021 Appellee's Brief at 8.) Appellee argues, the videos were admissible under Evid.R. 1003 as duplicates of the original. For the reasons stated below, we agree with appellee.

{¶ 17} Under Evid.R. 1002, to prove the content of a recording the original recording is required, unless provided otherwise by the rules of evidence or statute. However, "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Evid.R. 1003. A duplicate is defined as:

> [A] counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original. A "duplicate" includes a counterpart from which personal identifiers have been omitted pursuant to Rule 45 of the Rules of Superintendence for the Courts of Ohio, and which otherwise accurately reproduces the original.

Evid.R. 1001(4).

"The party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded." *State v. Tibbetts*, 92 Ohio St.3d 146, 160 (2001), citing *Natl. City Bank v. Fleming,* 2 Ohio App.3d 50 (8th Dist. 1981).

{¶ 18} It is in the sound discretion of the trial court to determine whether to admit a duplicate. *Id.*, citing *State v. Easter,* 75 Ohio App.3d 22, 27 (4th Dist. 1991). Unless a trial court "has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d 49, 64 (2001), citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984).

---

or hard drive is "not something that [the police] historically do. * * * [W]e have some detectives that are actually civilians they are not police officers, that respond out and download video * * * [b]ecause it's so complicated." *Id.* at 549. This complicated procedure combined with the limited time the officers had before the system erased the footage made recording the surveillance footage via cellphones necessary.

{¶ 19} This court has previously reviewed another case involving the duplication of surveillance video footage. In *State v. Ollison*, Yesenia Ollison and a group of women attacked Jermaria Clardy outside a market. *State v. Ollison*, 10th Dist. No. 16AP-95, 2016-Ohio-8269. When Clardy asked the store for a copy of the surveillance footage showing the assault, "the store would not provide a copy * * * but allowed her to record the footage with her cell phone as the footage played on a television in the market." *Id.* at ¶ 9. During trial, Ollison objected to the admission of the duplicate surveillance footage, arguing that "the authenticity of the video was 'hotly disputed' primarily due to its 'lack of completeness and gaps' and because to do so would be unfair." *Id.* at ¶ 53.

{¶ 20} On review of the law pertaining to duplicate video footage, we found:

> Several appellate courts have found video recordings of surveillance footage to be admissible duplicates pursuant to Evid.R. 1003. *See, e.g., State v. Taylor*, 8th Dist. No. 98107, 2012-Ohio-5421, ¶ 39 (cell phone video recording of portions of surveillance video and excerpted still-frame photographs admissible duplicates under Evid.R. 1003 where appellant did not raise genuine questions as to their trustworthiness); *State v. Garcia,* 3rd Dist. No. 5-01-12, 2001-Ohio-2262 (Sept. 10, 2001) (video duplicate of store surveillance video admissible under Evid.R. 1003 where defendant merely alleged, without strong support, that the duplicate may have omitted important parts and the maker of the duplicate testified that the duplicate was a true and accurate copy of the original); *State v. Jones*, 8th Dist. No. 102318, 2015-Ohio-4694, ¶ 36 (portions of video tape of a store surveillance footage an admissible duplicate where maker of duplicate testified that the footage was not altered or tampered with such that it should be deemed unreliable and that the duplicate accurately reflected the original).

*Ollison* at ¶ 52.

As appellant merely argued the video was incomplete and presented nothing further "discussing how these points impact authenticity," we concluded, "appellant did not meet her burden in raising a genuine question as to the authenticity of the original or demonstrating that in the circumstances it would be unfair to admit the duplicate in lieu of the original" and upheld the ruling of the trial court admitting the duplicate surveillance footage. *Id.* at ¶ 54.

{¶ 21} Here, our review of the record shows appellant did not meet his burden in raising a genuine question regarding the authenticity of the original or demonstrating that in the circumstances it would be unfair to admit the duplicate in lieu of the original. Appellant did not discuss Evid.R. 1003 in his motion in limine to the trial court, and, instead, argued the videos were prejudicial generally. Nor did he identify any specific acts or conduct by appellant, or others, that the video failed to depict.

{¶ 22} The record shows Officer Schlaegel reviewed all working camera videos that night, as "all videos played back on one screen that was split" and the screen showed "all the cameras that were online at the time." (Dec. 11, 2019 Tr. at 369.) Both Officer Schlaegel and Ghaidan verified that the cellphone footage of the surveillance video presented to the jury "accurately depict[ed]" the surveillance video that was captured by the surveillance system that night and recorded by the police officers on their cellphones. *Id.* at 284-85.

{¶ 23} Accordingly, applying *Ollison*, we find the cellphone recordings of the surveillance footage meets Evid.R. 1003 as duplicate recordings. Appellant did not meet his burden in proving the trial court acted unreasonably, arbitrarily, or unconscionably in this case. Therefore, we find that the trial court did not abuse its discretion by admitting the duplicate recording of the original surveillance footage into evidence.

{¶ 24} For the foregoing reasons, we overrule appellant's first assignment of error.

**B. Appellant's Second Assignment of Error**

{¶ 25} In appellant's second assignment of error, appellant argues that his convictions of felonious assault and improper handling of a firearm are against the manifest weight of the evidence.

{¶ 26} Appellant asserts six arguments as to why the convictions are against the manifest weight of the evidence. Appellant argues: (1) none of the alleged victims actually saw him shoot a gun; (2) there is no muzzle flash or visible recoil of the gun on the video; (3) no gun was found in his car when he was arrested; (4) his clothing was not tested for residue; (5) gun residue was found only on one of appellant's hands, when the video shows the shooter holding the gun with two hands; and (6) a witness testified that he shook appellant's hand after the witness shot a gun. (Appellant's Brief at 10.) Appellant asserts this evidence shows the jury "lost its way." *Id.* We disagree.

{¶ 27} When considering whether a jury verdict is against the manifest weight of the evidence, after review of the entire record, a reviewing court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury, in resolving conflicts in the evidence, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). The power to grant a new trial is discretionary and should be used only in exceptional cases in which "the evidence weighs heavily against the conviction." *Id.* at 175.

{¶ 28} "[T]he criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382 (2007). Under a challenge to the manifest weight of the evidence, the believability of the evidence is questioned, and a reviewing court must "determine which of the competing inferences is more believable." *State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 21, quoting *State v. Woullard*, 158 Ohio App.3d 31, 48 (2nd Dist.2004). "However, an appellate court 'may not substitute its judgment for that of the trier of fact on the issue of the credibility of the witnesses unless it is patently apparent that the factfinder lost its way.' " *Id.* Therefore, "we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14, citing *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26.

{¶ 29} A "[m]ere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment" on manifest weight grounds. *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7, citing *State v. Wilson*, 113 Ohio St.3d 382, 387. "[T]he presence of conflicting evidence does not render a verdict against the manifest weight of the evidence." *State v. Morris*, 10th Dist. No. 18AP-208, 2018-Ohio-5252, ¶ 51, citing *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43. "[A] conviction is not against the manifest weight of the evidence merely because the trier of fact believed the state's version of events over the defendant's version." *Morris* at ¶ 51, citing *Lindsey* at ¶ 43.

{¶ 30} The jury found appellant guilty of three counts of felonious assault in violation of R.C. 2903.11(A)(2). Under R.C. 2903.11(A)(2), "No person shall knowingly do either of the following: * * * Cause or attempt to cause physical harm to another or to

another's unborn by means of a deadly weapon or dangerous ordnance." Appellant was also found guilty of one count of improper handling of a firearm in violation of R.C. 2923.16(B). Under R.C. 2923.16(B), "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle."

{¶ 31} As it is the sum of the evidence that appellant argues led the jury astray, we address all six of appellant's arguments in turn.

{¶ 32} First, appellant asserts none of the alleged victims saw him shoot a gun. The evidence establishes that appellant pulled out of the drive thru and stopped in the parking lot. He exited the car and pointed a gun at the drive thru. During this time, all three victims headed into the office area. While it may be unclear where all of the victims were during the entire incident, there is testimony from two witnesses that they saw appellant with a gun in his possession. Further, during the trial, Hamed identified appellant as the shooter.

{¶ 33} Second, appellant asserts there is no muzzle flash or visible recoil of the gun on the video. During trial, Detective Morrow, a detective on the Columbus Division of Police for over 23 years with 16 years of training and experience in firearms, including muzzle flashes, recoil, and projectiles, explained that a "muzzle flash is just unburnt powder making contact with the air and igniting." (Dec. 11, 2019 Tr. at 437.) Detective Morrow stated that various factors can change the amount of a muzzle flash, including retardants on the ammunition, the amount of light at the scene, or atmospheric conditions. Additionally, the quality of a video taken at an incident can affect the visibility of a muzzle flash. Officer Schlaegel also testified that "you don't necessarily always see muzzle flash." *Id.* at 372. Both men testified that more light can detrimentally impact the amount of muzzle flash that occurs, with Detective Morrow confirming, "the more light you have at a scene, the harder it might be and in a video to see a muzzle flash[.]" *Id.* at 437.

{¶ 34} Regarding the visible recoil movement, Detective Morrow testified that he witnessed the gun recoil twice in the video footage and the movement in the video is "consistent with recoil." *Id.* at 447, 455, 458. Officer Schlaegel testified that he could not see any recoil on the video. However, Officer Schlaegel stated, he thought appellant was "firing when he pointed the gun[.]" *Id.* at 372. Detective Morrow testified that recoil on a

gun can vary depending on the size of the shooter, type of gun, or how the shooter holds the gun.

{¶ 35} Review of the video footage shows the appellant parks his car outside of the business, exits it, and points a gun in the direction of the business while walking forward. (State's Ex. D.) Appellant then walks backwards, returning to his car, and keeping his hands securely on the gun, facing the business until he is back inside the vehicle. *Id.*

{¶ 36} Third, appellant argues because the gun was not found in his car after he was arrested that he could not be the shooter. The evidence that no gun was found in appellant's car is undisputed. However, this fact is not dispositive of appellant's guilt of the charges filed.

{¶ 37} Regarding appellant's fourth and fifth arguments, that appellant's clothing was not tested for residue and that gun residue was only found on appellant's left hand, we address the facts of the record on this issue together. On October 6, 2018 at 1:56 a.m., Detective Lemmon collected gunshot residue samples on each of appellant's hands. Included in the kit was a submission form, which Detective Lemmon completed by asking appellant the listed questions and documenting the answers on the sheet. On review of State's Exhibit E-1, the submission form, key information sought for the analysis of the gunshot residue collection from appellant included information that appellant is right handed; appellant handled fireworks prior to the shooting; and appellant worked as a paver.

{¶ 38} Donna Schwesinger ("Schwesinger"), an employee of the Ohio Bureau of Criminal Investigation and an expert in the field of gunshot residue, analyzed appellant's gunshot residue kit. At trial, Schwesinger testified that gunshot residue is a vaporous cloud that ranges up to three feet to the sides of the weapon, depending on the weapon itself, and can easily be removed from surfaces, like the hands. Schwesinger explained, "A finding of particles characteristic of gunshot primer residue on a person's hands means that individual either discharged a firearm, was in the vicinity of the firearm when it was discharged, or handled an item with gunshot primer residue on it." (Dec. 11, 2019 Tr. at 408-09.) Based on the results of appellant's gunshot residue kit, Schwesinger stated, "a particle characteristic of gunshot primer residue was identified on one of the samples from [appellant] * * * on the left hand." *Id.* at 407-08.

{¶ 39} Upon cross-examination, appellant's trial counsel inquired whether clothing may contain traces of gunshot residue. Schwesinger confirmed clothing can retain gunshot residue, but no further discussion regarding the testing of clothing or specifically appellant's clothing was illustrated.

{¶ 40} Finally, appellant asserts that evidence from a defense witness, Hunter Leeport ("Leeport"), shows an alternate source where appellant could have come into contact with gunshot residue. At trial, Leeport testified that he shook appellant's hand after dove hunting on his property with a shotgun and shooting six or seven birds. Leeport stated appellant arrived at his property sometime before sunset, potentially two hours before dark and shot off fireworks for approximately an hour. Schwesinger testified that the cutoff for a gunshot residue test is between four to six hours. Schwesinger explained, "[T]ypically in that amount of time [the shooter] has washed their hand or [was] active enough that the residue can be removed." *Id.* at 398.

{¶ 41} Here, the jury was presented with testimony of several witnesses, including the victims. " '[W]here a factual issue depends solely upon a determination of * * * the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding * * * as being against the manifest weight of the evidence.' " *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26. "It is the province of the factfinder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's testimony." *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 72, citing *State v. Eisenman*, 10th Dist. No. 10AP-809, 2011-Ohio-2810, ¶ 19. " 'The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.' " *Id.*, quoting *State v. Williams*, 10th Dist. No. 08AP-719, 2009-Ohio-3237, ¶ 16.

{¶ 42} We find evidence in the record supports the credibility determination made by the jury. The jury was in the best position to view the manner and demeanor of the victims, detective, officer, trace analyst, and defense witness while each testified, and the jury was in the best position to determine whether their trial testimony was credible.

{¶ 43} When reviewing all the evidence, there is sufficient evidence to prove, beyond a reasonable doubt, each of the elements of felonious assault with a three-year gun specification and improper handling of a firearm.  Additionally, we cannot say that the jury lost its way in resolving inconsistencies in the trial testimony and duplicate surveillance footage.  Therefore, appellant's convictions are not against the manifest weight of the evidence.

{¶ 44}  For the foregoing reasons, we overrule appellant's second assignment of error.

## IV.  CONCLUSION

{¶ 45} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and KLATT, JJ., concur.

_____